AER–AEROTRON, INC., Appellant,

v.

**TEXAS DEPARTMENT OF TRANSPORTATION,**
Appellee.

No. 03–97–00649–CV.

Court of Appeals of Texas,
Austin.

June 17, 1999.

Rehearing Overruled Sept. 10, 1999.

Elizabeth G. Bloch, Hilgers & Watkins, P.C., Austin, for Appellant.

John Cornyn, Attorney General, Rodney D. Parrott, Assistant Attorney General, Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices JONES, KIDD, B.A. SMITH, YEAKEL and POWERS.*

* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

BEA ANN SMITH, Justice.

On its own motion the Court has submitted this cause for *en banc* consideration. Appellant Aer–Aerotron, Inc. sued appellee Texas Department of Transportation for breach of contract. Asserting that Aerotron had not obtained legislative consent to sue, the Department claimed immunity from suit and moved to dismiss for want of jurisdiction. The trial court dismissed the cause solely on jurisdictional grounds.[1] We will reverse the order of dismissal and remand the cause to the trial court.

## FACTUAL BACKGROUND

We determine the trial court's jurisdiction from the good-faith factual allegations made by the plaintiff. *See Brannon v. Pacific Employers Ins. Co.,* 148 Tex. 289, 224 S.W.2d 466, 469 (1949); *Flowers v. Lavaca County Appraisal Dist.,* 766 S.W.2d 825, 827 (Tex.App.—Corpus Christi 1989, writ denied). Unless the defendant pleads and proves that such allegations were fraudulently made to confer jurisdiction, they are accepted as true. *See Flowers,* 766 S.W.2d at 827; *see also Firemen's Ins. Co. v. Board of Regents of the Univ. of Tex. Sys.,* 909 S.W.2d 540, 542 (Tex.App.—Austin 1995, writ denied). The Department has not asserted any fraudulent pleading here. We take our recitation of facts from Aerotron's pleadings.

In 1991, the Department sought to standardize the radios used in its districts throughout the state. Aerotron made a bid to supply standard base-station radios and one model of remote-control units for use in the field. On April 25, 1991, the Department accepted Aerotron's bid and entered into a one-year contract for Aerotron to supply 75 base-station radios at $5490 each and 50 remote-control radios at $1136 per unit, for a total of $468,550.

1. The Department also asked the court to dismiss because limitations had run. The trial court specifically based its dismissal on the state's assertion of sovereign immunity.

The contract required Aerotron to ship a sample of each radio to the Department, which then had up to 30 days to test them for conformity to the contract specifications. On June 28, 1991, Aerotron shipped the two samples. The Department tested them and asked for certain modifications, which Aerotron made. On October 16, 1991, the Department "specifically and unequivocally" approved the modified samples and authorized Aerotron to ship 40 of the base stations and 48 remote-control units within 60 days.

On December 9, the Department extended the term of the contract for one year; the following day, it ordered 25 additional remote-control units. On January 3 and 6, 1992, Aerotron shipped 88 radios and the Department accepted them. On February 7, the Department ordered 75 additional base stations and 50 more remote-control units; on April 23 it ordered 25 more remote units. In the first year of the contract, the Department increased its purchase order from 125 to 300 radios, raising the total contract price to $993,900.

During the first part of 1992, the Department paid $396,804 for 127 radios it had received. In May 1992, after the Department had accepted more radios, it began to complain that some of the units failed to meet contract specifications. Aerotron addressed the problems and received the Department's acknowledgment that at least three of its four complaints had been corrected. On June 15, the Department ordered 50 additional base stations; on July 27, it ordered 25 more remote-control units. Aerotron asked the Department in August 1992 to pay invoices that had fallen due in March. In response to this request for payment, the Department raised additional complaints that the radios did not conform to specifications, despite its acceptance and request for additional radios.

On December 17, 1992, the Department demanded that Aerotron refund $396,804 for all radios that the Department had received and paid for, noting that it would return the radios as soon as it could get them "back from the districts." Additionally, the Department canceled the balance of its purchase order.[2] On December 24, Aerotron suggested that the Department had breached its obligations under the contract by its failure to pay $225,258 for radios received and accepted, and insisted that the Department fulfill its own contractual obligations by paying the balance due. Nevertheless, Aerotron again offered to modify the radios it had delivered to satisfy the Department. The Department subsequently authorized the modifications and in March 1993, Aerotron began fixing the problems. In April 1993, the Department ordered 13 more remote-control radios.[3] The Department expressed its appreciation for Aerotron's willingness to make corrections. Aerotron's technicians gave hands-on training throughout the state to Department users of its radios. In June, Aerotron began to help install equipment in all districts and stationed a technician in Texas to monitor the operation of the equipment. In July 1993, the Department assured Aerotron that it would pay its outstanding bill by the end of its fiscal year, August 31. But in August, the Department said that it could not pay Aerotron out of its current budget and would pay in early September.

In a letter dated September 9, 1993, Aerotron's president Andrew Kostantinidis again requested payment, detailing the hardships that the Department's failure to pay had caused the company, forcing it to

---

2. This cancellation caused Aerotron to reply, "The source of the problem is not Aerotron, it is that your budgetary restrictions prevented you from educating the users and maintainers of the newly designed system." Letter from Ernest Schwabe, then president of Aerotron, dated December 24, 1992. On February 2, 1993, the Department responded, "Lack of Aerotron manuals, not budgetary restrictions, prevented us from training our users on Aerotron equipment."

3. Although not documented in the record, the dates reflect that the Department extended the contract for a third year.

file Chapter 11 bankruptcy. Kostantinidis noted that, to satisfy the Department's complaints, the company had made nine separate modifications to the equipment, none of which he believed were required by the specifications. "I believe there is no end to what we are being asked to do to modify our radio equipment," wrote Kostantinidis. "The fact is that the equipment met the specifications and was not only accepted by the department's radio group but orders continued to flow to Aerotron. The purchase contract was both increased in quantities and renewed by the department." Kostantinidis closed by saying that Aerotron "remains willing to arrive at a suitable resolution to the department's requirements. Once your account becomes current we are willing to continue with the program agreed on in June. . . ." The Department's response came October 21, 1993; instead of sending payment, it announced it would return all radios accepted but not paid for,[4] demanded that Aerotron fix all the radios it had paid for or refund the entire $396,804, and canceled all pending orders. In the same letter, the Department conceded that Aerotron had "incurred considerable cost in attempting to fix the radios" and that the president of Aerotron, the technician, and the engineering staff had spent "countless hours" working on the problem. The Department added that it shared Aerotron's "frustration" but believed that Aerotron had been given sufficient time to fix the radios. Aerotron's suit for breach of contract followed.

## DISCUSSION

*Breach of Contract*

■ It has long been recognized that sovereign immunity protects the State from lawsuits for damages, absent legislative consent to sue the State. *See, e.g.,* *Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). The term "sovereign immunity" actually includes two principles: immunity from suit and immunity from liability. *See id.* Immunity from suit bars legal action against the State, even if the State acknowledges liability for the asserted claim, unless the legislature has given consent to sue. *See id.* Immunity from liability protects the State from judgments even if the legislature has expressly given consent to sue. *See id.* When the State enters into a contract with a private entity, it gives up its immunity from liability but not its immunity from suit. *See id.*

In *Federal Sign,* the plaintiff company signed a contract with Texas Southern University ("TSU") to construct and deliver basketball scoreboards to TSU. Seven months later, before the scoreboards were delivered, TSU indicated it had decided to secure the scoreboards from another source. Federal Sign sued for breach of contract, asserting damages for lost profits and expenses. The trial court overruled TSU's plea to the jurisdiction, submitted the case to a jury, and rendered judgment on the jury verdict in favor of Federal Sign. On appeal, the supreme court considered a narrow issue: whether the State waives its immunity from suit by contracting with a private citizen. The majority held: "The act of contracting does not waive the State's immunity from suit." *Federal Sign,* 951 S.W.2d at 408. The court went on to explain, however, that its decision was limited to the particular facts presented:

> We hasten to observe that neither this case nor the ones on which it relies should be read too broadly. We do not attempt to decide this issue in any other circumstances other than the one before us today. There may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts.

---

4. Aerotron's pleadings, which we must accept as true, claimed that $221,876 was due and owing for radios that had been shipped to the Department earlier in 1992 on March 20, March 27, April 3, May 1, July 2, August 26, and August 28. Aerotron asserted other damages that brought the total balance due to $242,899.

*Id.* at 408 n. 1. Moreover, four of the six justices constituting the majority also joined a concurring opinion emphasizing that "the Court's opinion is limited, despite some occasional broad language." *Id.* at 412 (Hecht, J., concurring).

The broad language found in the majority's opinion states that "it is the Legislature's sole province to waive or abrogate sovereign immunity." *Id.* at 409. Absent further discussion, that would end the matter. But we cannot ignore the court's clear suggestion that there may be circumstances where the State, by engaging in conduct involving more than signing a contract, may waive its immunity from suit. The court on one hand appears to say that only the legislature can waive or abrogate sovereign immunity, while on the other it indicates that state entities may by their conduct waive immunity from suit in some circumstances. We are constrained to harmonize the above language with the declaration of the majority and the concurring opinions that *Federal Sign* was expressly intended to be a limited ruling. We do so by focusing on the narrow issue that was before the supreme court: whether TSU's act of signing a contract waived its immunity from suit.

The *Federal Sign* majority held that it was up to the legislature to abrogate immunity from suit when the State merely enters a contract. We read the court's opinion to mean that only the legislature can generally pronounce that the mere act of signing a contract abrogates the State's immunity from suit, but an entity of the State may waive its immunity with regard to a particular contract if warranted by its conduct. Thus, our task is to confront the issue left unresolved by the supreme court in *Federal Sign:* did the Department engage in conduct, beyond the mere execution of the contract, that waived its immunity from suit?

We have outlined the Department's conduct in detail, taking as true the facts alleged in Aerotron's petition. *See Fire-*

*men's Ins. Co.,* 909 S.W.2d at 542. Initially, the Department had 30 days to test the prototype of both radio units; it requested some modifications, which Aerotron made. The Department then approved the modified samples and authorized Aerotron to manufacture and ship 88 radio units. As further evidence of its approval of the product, the Department accepted and paid for 127 radios, twice extended the contract term, and continued to increase the number of units ordered. The Department first raised complaints about some of its radios in May 1992. Aerotron apparently satisfied its concerns because the Department ordered additional radios in June and again in July 1992. But in August 1992, when Aerotron asked the Department to pay $225,258 owing for radios in its possession, the Department responded by raising more complaints. Then in December 1992, more than a year and a half into the contract, the Department demanded that Aerotron refund all monies received under the contract and told Aerotron that it would return every radio. Aerotron again tried to work with the Department to modify the equipment to meet the Department's needs. Aerotron apparently succeeded, because the Department again ordered more radios in April 1993. In both July and August of that year, the Department promised to pay its balance due to Aerotron. But in October, the Department attempted to return all radios it had not paid for in lieu of paying its bill, demanded a full refund of all monies paid under the contract, and again canceled all pending orders.

The Department did more than sign this contract. Its actions over a period of two and a half years fully implicated it in the performance of the contract: the Department approved the radios after testing the samples; it twice extended the term of the contract; it more than trebled the number of radio units ordered throughout the contract term;[5] it accepted Aerotron's techni-

---

5. The original contract provided for a total of 125 radios; after all the increases documented in the pleadings, the Department had ordered a total of 383 radios.

cal services; and it acknowledged its financial obligations by twice promising to pay the balance due to Aerotron. Aerotron filled the ever-increasing orders, made more than nine modifications that were not required under the contract specifications, helped the Department install equipment in all districts, and stationed a technician in Texas to monitor the operation of its equipment for the Department. On September 9, 1993, Aerotron's president asked the Department, "How, after all the above, can the department state that the first and all other units as well did not meet the specifications?" Outlining the economic damage that Aerotron had suffered due to the Department's failure to pay for equipment it had received, Kostantinidis continued, "If in fact the units did not meet the specifications it was the Department's obligation to reject them and at that point there would be no further manufacturing nor would additional inventory of production parts be purchased by Aerotron."

If conduct can ever waive immunity from suit, as the supreme court suggested in *Federal Sign,* we hold that under these circumstances the Department has waived its immunity from suit and must now appear to answer Aerotron's breach of contract claims. We note that since the supreme court handed down *Federal Sign,* two courts of appeals have identified circumstances in which the State, by its conduct, has waived its immunity from suit for breach of contract. *See Texas S. Univ. v. Araserve Campus Dining Servs., Inc.,* 981 S.W.2d 929 (Tex.App.—Houston [1st Dist.] 1998, pet. denied); *Alamo Community College Dist. v. Obayashi Corp.,* 980 S.W.2d 745 (Tex.App.—San Antonio 1998, pet. denied). We consider the circumstances presented in this cause to more fully implicate the Department in the performance of its contract than the conduct of the State in either of those cases. We sustain the points of error raised in Aerotron's first and second issues, and therefore do not address Aerotron's third issue.

## CONCLUSION

Relying on the majority's instruction to read its holding in *Federal Sign* narrowly, we distinguish this cause in which the Department has done much more than merely sign a contract. Because that is all that the supreme court decided in *Federal Sign,* we accept the court's invitation to consider factually distinct circumstances where the Department by its conduct— accepting the radios, extending the term of the contract, increasing its orders, twice promising to pay the balance due, requesting and receiving technical modifications and assistance—has waived its immunity from suit for breach of contract. We therefore reverse the trial court's judgment dismissing Aerotron's cause of action for want of jurisdiction and remand the cause to that court for further proceedings.

Justice PATTERSON not participating.