**TSUMI, INC. and Cheryl Eckhom, Appellants,**

v.

**TEXAS PARKS AND WILDLIFE DEPARTMENT and Parks and Wildlife Foundation of Texas, Inc., Appellees.**

No. 03–99–00205–CV.

Court of Appeals of Texas, Austin.

Feb. 25, 2000.

Randy Howry, Herman & Howry, L.L.P., Austin, for appellants.

Rande K. Herrell, Asst. Atty. Gen., Financial Litigation Division, Austin, for appellees.

Before Justices JONES, KIDD and PATTERSON.

JAN P. PATTERSON, Justice.

The opinion and judgment issued by this Court on January 6, 2000, are withdrawn, and the following opinion is substituted in lieu thereof.

Appellants Tsumi, Inc. and Cheryl Eckhom[1] appeal the district court's order granting a plea to the jurisdiction filed by appellee Texas Parks and Wildlife Department.[2] In a single issue, Tsumi contends

---

1. For convenience, we will refer to Tsumi, Inc. and Cheryl Eckhom, Tsumi's majority owner, collectively as "Tsumi" or "appellants."

2. Parks and Wildlife Foundation of Texas, Inc. filed a separate plea to the jurisdiction, but it withdrew its plea; therefore, the district

that the district court erred in granting the Department's plea to the jurisdiction because the Department consented to suit and waived its sovereign immunity from suit. We affirm the district court's order.

## FACTS AND PROCEDURAL BACKGROUND

From 1993 through 1997, Tsumi and the Department operated under an oral agreement for the development, layout, production, and marketing of the Department's mail-order gift catalogs. Many of the items included in the catalogs were developed or supplied by Tsumi. For years 1995 and 1996, Tsumi designed the layout, developed the products, and supplied an average of over 85% of the products for four catalogs. Tsumi acknowledges that it was fully compensated for these goods and services. According to its first amended petition, Tsumi "tendered performance of services and performed fully and repeatedly throughout the contractual relationship with Defendant." At some point in 1997, Tsumi began work on the Department's 1997 Christmas catalog. In its petition,[3] Tsumi alleges that plaintiffs "have performed their obligations under the contract by, among other things, designing catalog layout and developing products therefor." They further allege that the Department repudiated the contract and failed to pay for unspecified services.

Tsumi brought suit against the Department for claims based on a breach of the alleged oral contract, defamation, fraud, and misappropriation. The Department filed a plea to the jurisdiction asserting that its sovereign immunity from suit deprived the trial court of jurisdiction. The trial court agreed and dismissed Tsumi's claims for lack of jurisdiction. On appeal, Tsumi challenges in a single issue the dismissal of its petition on the ground that the Department waived immunity from suit.[4]

## STANDARD OF REVIEW

■■■ Because the determination of subject matter jurisdiction is a question of law, we review that determination *de novo.* *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). We determine the district court's jurisdiction from the good faith factual allegations made by the plaintiff. *See Brannon v. Pacific Employers Ins. Co.,* 148 Tex. 289, 224 S.W.2d 466, 469 (1949). Unless the defendant pleads and proves that the plaintiff's allegations were fraudulently made to confer jurisdiction, they are accepted as true. *See Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996). Because the Department has not asserted any such fraudulent pleading here, we accept Tsumi's allegations as true; our recitation of the facts is taken from Tsumi's pleadings.

■■■ The plaintiff bears the burden of alleging facts affirmatively showing that the district court has subject matter jurisdiction. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993). A plea to the jurisdiction contests the district court's authority to determine the subject matter of the cause of action. *See Amador v. San Antonio State Hosp.,* 993 S.W.2d 253, 254 (Tex. App.—San Antonio 1999, pet. denied); *State v. Benavides,* 772 S.W.2d 271, 273 (Tex.App.—Corpus Christi 1989, writ denied).

court's order concerned only the Department's plea.

**3.** Tsumi's original petition was filed on December 21, 1998. The Department filed its original answer and plea to the jurisdiction on January 15, 1999. Tsumi filed its First Amended Petition on March 9, 1999. A hearing was held on the Department's plea to the jurisdiction on March 10, and on March 12, the district court sustained the plea and dismissed the case for want of jurisdiction. Tsumi did not seek to further amend its petition at the hearing or thereafter and does not contend on appeal that it was denied that opportunity.

**4.** Tsumi challenges only the dismissal of the contract claim.

■ Unless the face of the petition affirmatively demonstrates a lack of jurisdiction, the district court must liberally construe the allegations in favor of jurisdiction. *See Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989). When reviewing the district court's dismissal, we construe the pleadings in favor of the pleader and look to the pleader's intent. *See Texas Ass'n of Business,* 852 S.W.2d at 446.

## DISCUSSION

### Sovereign Immunity

■ Sovereign immunity consists of two basic principles of law: immunity from liability and immunity from suit. Unless waived, the state has immunity from liability.[5] Immunity from liability does not affect a court's jurisdiction to hear a case. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 520 (Tex.1988). Immunity from suit, on the other hand, bars an action against the state unless the state expressly consents to the suit. Because governmental immunity from suit defeats a trial court's subject matter jurisdiction, it is properly asserted in a plea to the jurisdiction. *See Texas Dep't of Transp. v. Jones,* 8 S.W.3d 636, 637 (Tex.1999); *Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997); *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 814 (Tex.1970). The party suing the governmental entity must establish the state's consent, which may be alleged either by reference to a statute or to express legislative permission. *See Jones,* at 637; *Missouri Pac. R.R. Co.,* 453 S.W.2d at 814.

■ Tsumi acknowledges that it did not seek legislative permission to sue. Appellants also do not contend that statutory authority exists that would constitute consent for them to bring their lawsuit. Rely-

ing upon *Federal Sign* and this Court's decision in *Aer–Aerotron, Inc. v. Texas Department of Transportation,* 997 S.W.2d 687 (Tex.App.—Austin 1999, pet. filed), Tsumi alleges instead that the Department has consented to be sued and has thus waived sovereign immunity by contracting with Tsumi and accepting its goods and services and full performance under the contract. The issue presented, then, is whether Tsumi has met its burden of pleading facts demonstrating that the State has waived its immunity *by conduct.*

### Federal Sign

In analyzing whether a state entity waives immunity in a contractual dispute *by conduct,* we turn first to *Federal Sign.* In that case, Texas Southern University ("TSU") accepted Federal Sign's bid to construct and deliver basketball scoreboards to TSU. *See* 951 S.W.2d at 403. After accepting Federal Sign's bid for the construction and installation of the scoreboards, TSU instructed Federal Sign to begin work immediately so that the scoreboards would be finished as soon as possible. Seven months later, before the scoreboards were delivered, TSU advised Federal Sign that it had decided to secure the scoreboards from another source. Later, TSU contracted with another company for the scoreboards. Federal Sign sued for breach of contract, asserting damages for lost profits and expenses. After a jury trial, the trial court rendered judgment in favor of Federal Sign. On appeal, the supreme court concluded that the suit was barred by sovereign immunity.

Starting from the premise that "sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State," *id.* at 405, Justice Baker, writing for the majority of

5. *See Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997); *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 813 (Tex.1970); Tex. Civ. Prac. & Rem.Code Ann. § 107.002(b) (West Supp. 1994) (legislative resolution granting permission to sue the state does not waive immunity from liability).

the court, stated: "[A] private citizen must have legislative consent to sue the State on a breach of contract claim. The act of contracting does not waive the State's immunity from suit." *Id.* at 408. Deferring instead to the legislature, the court concluded that "it is the Legislature's province to modify sovereign immunity if it is inclined to do so and therefore [we] refuse Federal Sign's invitation to undertake the task." *Id.* at 409. The court held "that sovereign immunity from suit without legislative consent applies to contract claims against the State." *Id.* at 412.

In an oft-cited footnote, however, the court further observed that "[t]here may be other circumstances where the State may waive its immunity *by conduct* other than simply executing a contract so that it is not always immune from suit when it contracts." *Id.* at 408 n. 1 (emphasis added). Despite Federal Sign's allegations of waiver by TSU's conduct in repudiating the contract seven months into the project, the court declined to find waiver. In a concurring opinion, four members of the court suggested that a different result might have pertained if: (i) Federal Sign had installed the scoreboards that were the subject of the contract and TSU, the state entity, refused to pay the agreed price, (ii) TSU had accepted the scoreboards, acknowledged that Federal Sign had fully complied with the contract but refused to pay as agreed upon, or (iii) TSU refused to pay to force Federal Sign to make a concession on another contract. *See id.* at 412. The concurring justices further stated: "[T]oday's decision does not hold that the State is always immune from suit for breach of contract absent legislative consent; it holds only that the mere execution of a contract for goods and services, without more, does not waive immunity from suit." *Id.* at 413. Thus, the

court left for another day the decision on the type of conduct by which a State may waive its immunity.

Appellants acknowledge that the simple act of entering into a contract is not sufficient to waive immunity. Appellants further recognize that while the supreme court has addressed the possibility of waiver *by conduct* of the state entity, that court has yet to find it in a decided case. They direct us, instead, to the decisions of three courts of appeals, including this one, that have abrogated sovereign immunity in contract cases involving agencies.[6]

In *Aer–Aerotron,* pursuant to a competitive bidding process and a written contract with the Texas Department of Transportation, Aerotron supplied 75 base-station radios and 50 remote-control radios for a total contract amount of $468,550. *See* 997 S.W.2d at 688. The contract required Aerotron to ship a sample of each radio to the Department, which then had up to 30 days to test them for conformity to the contract specifications. Aerotron alleged that it shipped the radios and the Department accepted them. In the first year of the contract, the Department increased its purchase order from 125 to 300, raising the total contract price to $993,900. The Department first promised payment, then delayed it, and then failed to pay, forcing Aerotron to file bankruptcy. Aerotron alleged in its petition that the State, by accepting goods and services, extending the term of the contract, increasing its orders, twice promising to pay the balance due but failing to do so, and requesting and receiving technical modifications and assistance, waived its immunity from suit for breach of contract when it engaged in actions that "fully implicated it in the performance of the contract." *Id.*

This Court interpreted *Federal Sign* to mean that "only the legislature can gener-

**6.** *See Texas Natural Resource Conservation Comm'n v. IT–Davy,* 998 S.W.2d 898 (Tex. App.—Austin 1999, pet. filed); *Aer–Aerotron, Inc. v. Texas Dep't of Transp.,* 997 S.W.2d 687 (Tex.App.—Austin 1999, pet. filed); *Little–Tex Insulation Co. v. General Servs. Comm'n,* 997 S.W.2d 358 (Tex.App.—Austin 1999, pet.

filed); *Texas S. Univ. v. Araserve Campus Dining Servs.,* 981 S.W.2d 929 (Tex.App.—Houston [1st Dist.] 1998, pet. denied); *Alamo Community College Dist. v. Obayashi Corp.,* 980 S.W.2d 745 (Tex.App.—San Antonio 1998, pet. denied).

ally pronounce that the mere act of signing a contract abrogates the State's immunity from suit, but an entity of the State may waive its immunity with regard to a particular contract if warranted by its conduct." *Id.* at 691. The Court applied its interpretation of *Federal Sign* to the facts of *Aer-Aerotron* and concluded that the Department by its conduct waived its immunity from suit for breach of contract. *See id.* at 692. The Court stated:

> The Department did more than sign this contract. Its actions over a period of two and a half years fully implicated it in the performance of the contract: the Department approved the radios after testing the samples; it twice extended the term of the contract; it more than trebled the number of radio units ordered throughout the contract term; it accepted Aerotron's technical services; and it acknowledged its financial obligations by twice promising to pay the balance due to Aerotron. Aerotron filled the ever-increasing orders, made more than nine modifications that were not required under the contract specifications, helped the Department install equipment in all districts, and stationed a technician in Texas to monitor the operation of its equipment for the Department.

*Id.* at 691–92.

In *IT–Davy*, the contractor alleged in its pleadings that it fully performed the contract and even executed additional work at the express request of the Commission, that the Commission accepted this work, and that the Commission failed to pay for the accepted services. *See* 998 S.W.2d 898, 902 (Tex.App.—Austin 1999, pet. filed). The contractor pleaded that it conferred a benefit on the agency and the agency accepted that benefit. *See id.* Likewise, in *Little–Tex,*[7] *Araserve,*[8] and *Obayashi,*[9] the contracting party alleged that it fully performed or that the agency accepted goods and services and engaged in conduct that would produce an injustice were the agency permitted to walk away. The conduct pleaded, then, fell beyond mere execution of the contract and arguably within the three hypotheticals in the concurring opinion of *Federal Sign.*

Drawing on the three hypotheticals in the concurring opinion of *Federal Sign,* Tsumi contends on appeal that it has alleged that the Department engaged in conduct here sufficient to waive its immunity: "Precisely such full performance, delivery of goods and services, and repeated acceptance of all benefits and performance occurred in [this] case." Even taking the allegations of Tsumi's petition as true and construing the pleadings in a liberal fashion as we are constrained to do, we conclude that the allegations contained in the petition fail to allege facts sufficient to sustain jurisdiction.

7. In *Little–Tex,* this Court described the acceptance of benefits and waiver of immunity as akin to the doctrine of estoppel. The Court stated: "We believe receipt and acceptance by the State of a benefit from a contracting party is wholly inconsistent with the State's using its immunity from suit to shield itself from a legal obligation to pay for the value of the benefit. Indeed, such a scenario arguably produces a manifest injustice that cannot in good conscience be tolerated." 997 S.W.2d at 364.

8. In *Araserve,* the plaintiff company contracted to provide and did deliver $122,778.50 in food and services that TSU requested but refused to pay for. *See* 981 S.W.2d at 930. Araserve sued for the value of the accepted goods and services. *See id.*

9. In *Obayashi,* Alamo Community College District entered into a contract with Obayashi Corporation for construction relating to a drainage project at the San Antonio College campus. *See* 980 S.W.2d at 746. After Obayashi completed the contract work for the base contract price of $983,000, the District refused to pay for equitable adjustments made that were necessary to complete the job. *See id.* at 747. The court found statutory consent to suit but, in *dicta,* it also found waiver of sovereign immunity by the District's conduct in instructing Obayashi to exclude certain necessary costs from its bid, establishing a contractual means to cover the costs with an equitable adjustment clause, and accepting Obayashi's performance as full and satisfactory.

### Tsumi's Allegations in the Petition

In the present case, Tsumi alleges that it has operated since 1993 under an oral contract with the Department.[10] In its brief on appeal, Tsumi contends that the duration of the contract between Tsumi and the Department was for a period of "around four years." Appellants acknowledge that they were fully compensated for their services through 1996. Other than an allegation that the parties entered into a contract for work on the 1997 Christmas catalog and that appellants performed their obligations under the contract by "designing Catalog layout and developing products therefor," none of the terms of the oral contract are set forth in the petition. The dispute, then, turns on the conduct of the parties in 1997. But on this matter, the petition is entirely silent.

Thus, Tsumi alleges that it "began" the development, layout, and marketing of the 1997 catalog, and that it entered into "several agreements with third-party vendors" for the marketing and operation of the catalog. Without specifying a time period or whether any goods or services were actually delivered and accepted, they then allege that the Department "untimely indicated" an unwillingness to complete the production and marketing of the catalog. Unlike Aerotron, Tsumi has not alleged that it completed performance on the 1997 catalog and that the Department refused to pay the agreed price. Nor is there any allegation that the Department accepted goods and services, acknowledged that Tsumi had fully complied with the contract, and then refused to pay as agreed upon. Accordingly, we overrule appellant's issue.

### CONCLUSION

We conclude that appellants did not allege waiver *by conduct* sufficient to invoke

10. The parties agree that any contract between the parties was oral and was not the result of a competitive bidding process. Tsumi alleges in its petition that the agreement remained oral because the Department wanted to avoid "bidding the job out." The legali-

the district court's jurisdiction. Having overruled appellant's issue on appeal, we affirm the district court's order granting the Department's plea to the jurisdiction.

**Sena THOMPSON, Individually and as Representative and Heir of the Estate of Omar J. Aycox, Appellant,**

v.

**CPN PARTNERS, L.P.; Premium Assets, Inc.; and Whelan Security of Texas, L.L.C., Appellees.**

No. 03–99–00663–CV.

Court of Appeals of Texas, Austin.

April 13, 2000.

ty or enforceability of an oral contract with the State is not before the Court. *See* Tex. Gov't Code Ann. § 2155.063 (West 2000) (requiring competitive bidding for the purchase of or contract for goods or services).

Edward J. Hennessy, Hennessy, Gardner & Barth, Houston, for Appellant.

John Kevin Leach, Houston, for Whelan Security.

Gregory R. Ave, Touchstone Bernays Johnson Beall & Smith, L.L.P., Dallas, for CPN Partners.

Samuel Edward Dunn, Houston, for Premium.

Before Chief Justice ABOUSSIE, Justices KIDD and B. A. SMITH.

BEA ANN SMITH, Justice.

In December 1996, CPN Partners, L.P. (CPN) owned the Commerce Park North shopping center (Commerce Park) in north Houston, Texas. Premium Assets, Inc. (Premium) managed and operated Commerce Park as CPN's agent. Whelan Security of Texas, L.L.C. (Whelan) contracted with Premium to provide security services for Commerce Park. Omar Aycox, appellant Sena Thompson's twenty-two year-old son, was an employee of an American Multi–Cinema, Inc. (AMC) movie theater located in Commerce Park, the premises of which AMC leased from CPN. Aycox was shot and killed during a robbery of the theater. There was no security guard inside the theater; Denisha Holmes, an unarmed Whelan security guard, was patrolling the Commerce Park parking lot.

Thompson sued CPN, Whelan, and Premium (appellees), Marvin F. Poer & Co. (Poer), and Holmes, alleging their negligence proximately caused Aycox's death. CPN, Premium, and Whelan moved for summary judgment on the grounds that they owed no duty to Aycox. The district court signed orders granting summary judgment for appellees, including in one a Mother Hubbard clause that effectively granted summary judgment for the two non-moving defendants as well. Thompson appeals, claiming the district court erred (1) in granting summary judgment in favor of Poer and Holmes, who did not move for summary judgment, and (2) in granting summary judgment for the three movants, who owed and breached duties to Aycox. We will affirm in part and reverse and remand in part.

## Did the district court err by granting more relief than was requested?

Thompson sued CPN, Premium, Whelan, Poer, and Holmes. In her original petition, Thompson requested service of citation be effected on CPN, Premium, Whelan, and Poer. As for Holmes, the petition stated "service of citation is not requested at this time." Answers filed by CPN, Premium, and Whelan appear in the appellate record. It does not appear that Holmes was served or that Poer ever answered; the record does not indicate whether Poer was actually served.

CPN, Premium, and Whelan each filed a separate motion for summary judgment. On July 30, 1999, the district court signed three separate orders granting judgment for the individual appellees. Premium's

order included a Mother Hubbard clause reading, "All relief not expressly granted in this Order is denied." Thompson complains that the inclusion of the Mother Hubbard clause erroneously granted summary judgment for Holmes and Poer. We agree.

An order granting summary judgment including a Mother Hubbard clause is treated as a final order for purposes of appeal. *See Bandera Elec. Coop., Inc. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex. 1997). This is true even when the order arises out of a motion for partial summary judgment. *See id.* When a trial court grants more relief than requested by signing an order that but for a Mother Hubbard clause would grant partial summary judgment, that order is final and appealable, although erroneous. *See id.; Page v. Geller,* 941 S.W.2d 101, 102 (Tex.1997). We treat such an order as final and appealable, consider all matters raised on appeal, and reverse only the portions of the order that were rendered in error. *See Page,* 941 S.W.2d at 102.

Appellees' motions for summary judgment each requested judgment only for the movant. Holmes and Poer were not parties to any of the motions for summary judgment. The inclusion of the Mother Hubbard clause erroneously granted Premium more relief than it requested in its motion. *See id.; Lee v. El Paso County,* 965 S.W.2d 668, 671 (Tex.App.— El Paso 1998, pet. denied). We reverse the portion of the district court's judgment disposing of claims not addressed in the motions for summary judgment and re-

mand the cause for further proceedings on Thompson's claims against Holmes and Poer.

### Did the district court err in granting summary judgment for appellees?

To be entitled to summary judgment, a movant must establish that there are no genuine issues of fact and that it is entitled to judgment as a matter of law. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). A defendant seeking summary judgment must either negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter of law each element of an affirmative defense. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant produces evidence establishing its right to summary judgment, the burden shifts to the plaintiff to present evidence raising a fact issue. *See id.* In reviewing the granting of summary judgment, we take as true all evidence favorable to the non-movant and indulge all reasonable inferences in her favor. *See id.*

A plaintiff bringing a negligence suit must establish both the existence and the violation of a duty owed by the defendant to the plaintiff. *See id.* Whether a defendant owes a duty is a question of law. *See Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997); *Centeq Realty,* 899 S.W.2d at 197; *Coleman v. Equitable Real Estate Inv. Management, Inc.,* 971 S.W.2d 611, 615 (Tex.App.—Dallas 1998, pet. denied).[1] Generally, a person has no

---

1. Thompson attacks *Coleman,* arguing it wrongly treats inadequate-security causes of action as standard premises-defect causes of action and uses an artificial distinction between leased premises and common areas. She argues better reasoning is found in *Cain v. Timberwalk Apartments Partner, Inc.,* 942 S.W.2d 697 (Tex.App.—Houston [14th Dist.] 1997), *rev'd on other grounds,* 972 S.W.2d 749 (Tex.1998). Initially, we note that *Cain* concerned a residential apartment landlord's duty to provide security measures to protect its tenants, whereas this case, like *Coleman,* concerns a commercial landlord's duties to its commercial tenants and those tenants' employees. *See Coleman,* 971 S.W.2d at 616; *Cain,* 942 S.W.2d at 699. The *Coleman* landlord retained a right of access to the leased property on twenty-four hours notice or in an emergency for inspections, showing the property to prospective renters, or maintenance and repairs, and the landlord retained control over the common areas, but did not retain sufficient control over the leased premises to give rise to a duty to the tenant's employees.

Each appellee argues it had no control over security in the leased premises and therefore owed no duty to Aycox. Thompson contends she presented evidence in response to appellees' motions for summary judgment that raised a fact question as to whether each appellee had such a duty. She claims the evidence indicates

CPN and Premium intended to retain control over security for the entire premises, including leased properties, thus giving rise to a duty to protect AMC's employees. Whelan, she argues, had a contractual duty to patrol the entire property and to make security recommendations to CPN and Premium.

*Appellees' summary judgment evidence*

As evidence that they had no duty to Aycox, all three appellees pointed to the contract under which Whelan agreed to provide security services at Commerce Park (the security contract) and the lease under which AMC took control of the theater premises (AMC's lease). In the security contract, Whelan agreed to "[p]rovide unarmed guard services" from 6:00 p.m. to 6:00 a.m., Monday through Friday, and from 12:00 p.m. to 6:00 a.m. on Saturdays and Sundays. The contract does not set out which areas of Commerce Park were to be patrolled.

AMC's lease defines "common facilities" as including "parking areas, streets, driveways, curb cuts, access facilities, aisles, sidewalks, malls, landscaped areas, lighting and other common and service areas" within Commerce Park. AMC agreed to pay a "common area charge" as partial reimbursement to CPN for "common area expenses," which were defined as CPN's costs of "maintaining, repairing, insuring, lighting, protecting and securing the Common Facilities on the Entire Premises...." CPN's access to AMC's leased premises is restricted as follows:

> Tenant shall permit Landlord and the authorized representatives of Landlord to enter Tenant's Building at all reason-

*See Coleman*, 971 S.W.2d at 616. The parties' relationships in *Coleman* are much more on par with our case than those in *Cain*.

Further, in reversing the court of appeals' in *Cain*, the supreme court stated, "A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises liability claim.... Cain asserts that defendants' failure to provide adequate security measures created an unreasonable risk of harm that defendants knew or

should have known about and yet failed to correct. This is a premises liability claim ." *Cain*, 972 S.W.2d at 753.

Thompson's claim that *Cain* should control over *Coleman* is unpersuasive. Likewise unpersuasive is her attempt to distinguish *Coleman* from the case at bar by arguing that the *Coleman* landlord's access to the leased premises was significantly more limited than in our case.