REVISED APRIL 14, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 25, 2008

Charles R. Fulbruge III
Clerk

No. 06-20740

UNITED STATES OF AMERICA ex rel. MARSHA FARMER,

Plaintiff-Appellant,

v.

CITY OF HOUSTON; HOUSTON AREA URBAN LEAGUE,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:03-CV-3713

Before JONES, Chief Judge, REAVLEY and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Marsha Farmer brought an action on behalf of the United States against the City of Houston, Texas, and the Houston Area Urban League ("HAUL"), alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a). Farmer claimed that defendants unlawfully received federal funds from the United

States Department of Housing and Urban Development ("HUD") based on false and fraudulent information. After the United States declined to intervene and extensive discovery had been conducted, defendants moved for summary judgment, and the city moved to dismiss for lack of jurisdiction. The district court granted the motions for summary judgment and denied the motion to dismiss.

Farmer appeals. Because she is unable to show that the city or HAUL acted with knowledge of any falsity or that defendants agreed with each other to defraud the government, we affirm.

I.

Farmer's action concerns the city's Emergency Home Repair Program ("EHRP"), which is funded by HUD as part of its Community Development Block Grant program ("CDBG"), under which HUD granted the city access to a line of credit to be used for certain types of residential repair projects. A requirement of receiving these funds was that the city's management and expenditures were expressly subject to audit by HUD.[1]

The city, in turn, chose HAUL, a non-profit corporation, to perform certain EHRP projects. HAUL elected to retain third-party contractorsSSas opposed to its own employeesSSto perform the relevant repairs. The city reimbursed HAUL based on invoices that were submitted by those contractors. The reimbursements were paid from CDBG funds.

Farmer's involvement with the EHRP began in 2001 when she applied for assistance after her roof suffered damage during tropical storm Allison. Inspectors were dispatched to determine whether Farmer qualified for the EHRP. The

---

[1] Under the CDBG program, HUD is required "at least on an annual basis" to "make such reviews and audits as may be necessary" to ensure that a CDBG grantee's use of funds is appropriate. 42 U.S.C. § 5304(e). If HUD determines that CDBG funds have been used improperly, it is authorized to request the grantee to reimburse HUD for the unauthorized expenditures. See 24 C.F.R. § 570.910(b)(5).

inspectors examined her property and, based on their estimates of what it would cost to complete the necessary repairs, determined that she did not qualify,[2] so no work was performed on her house.

When Farmer reviewed the inspector's written estimates, however, she noticed that something seemed amiss: The estimates included several incorrect quantities of materials, most notably that 4,000 square feet of roofing material would be required. Only half that amount had been needed the last time Farmer had had her roof replaced. She became suspicious.

Using data obtained by means of the Texas Public Information Act, Farmer assiduously investigated other properties assigned to HAUL under the EHRP. She compared, for instance, the city's disbursements to HAUL for roof repairs with estimates of roof size that she obtained from the Harris County Appraisal District. Using a similar approach, she analyzed expenditures for gutters, water lines, windows, smoke detectors, counter tops, foundations, and the like. Based on her analysis, she believed the EHRP was being bilked, with reimbursements being approved and building materials being paid for far in excess of what was necessary or actually provided.[3]

## II.

Using that research, Farmer alleged that defendants had made false and fraudulent claims that had been paid using federal funds. In September 2003, after providing notice to the Attorney General of the United States and to the

---

[2] In 2001, when Farmer first applied to the EHRP, the repair cost limits were $15,000. In about late 2002, these limits were increased to $20,000.

[3] HUD apparently agreed with Farmer, at least as to whether the reimbursements received by HAUL were exorbitant. HUD audited a number of reimbursement requests, including the claims alleged by Farmer to be false, and, as a result of the audit, suspended its involvement with the EHRP and requested the city to reimburse HUD for all improper expenditures.

United States Attorney for the Southern District of Texas, she filed a complaint on behalf of the United States, alleging that defendants had violated the FCA. She also claimed that defendants had failed to comply with the EHRP requirements, and she asserted a claim for money had and received.

After the United States decided not to intervene, Farmer filed an amended complaint, and defendants each filed a motion to dismiss. The court granted those motions in part, dismissing Farmer's claims for money had and received and for defendants' alleged failures to comply with program requirements; the court permitted the FCA claims to go forward.

Following discovery, defendants moved for summary judgment, and the city once again moved to dismiss, this time based on allegedly newly discovered information that Farmer was not an "original source" of the information about the supposed fraudulent claims and thus was jurisdictionally barred from bringing an FCA suit under 31 U.S.C. § 3730(e)(4)(A). In support of their summary judgment motions, defendants argued that, for myriad reasons, Farmer had failed to establish a prima facie case under the FCA.[4]

Regarding § 3729(a)(2), defendants argued that under United States ex rel. Totten v. Bombadier Corp., 380 F.3d 488 (D.C. Cir. 2004), a plaintiff must present evidence that a false or fraudulent claim was presented to an officer or employee of the federal government. According to defendants, Farmer could not establish that such a presentment had taken place, because HUD's post-disbursement audit process was legally inadequate, and Farmer could point to no other potential presentment. Also regarding § 3729(a)(2), defendantsSSprimarily HAULSSargued that Farmer had failed to proffer sufficient evidence from which a reasonable jury could conclude that there were any knowingly false state-

---

[4] In her response to defendants' motions for summary judgment, Farmer made it plain that she was pursuing claims only under 31 U.S.C. § 3729(a)(2) and (3) and was abandoning any claims under § 3729(a)(1) and (4)-(7).

ments, a fundamental scienter condition for liability under the FCA.[5]   For § 3729(a)(3), defendants argued that there was insufficient evidence from which a reasonable jury could find a conspiracy between the city and HAUL to defraud the federal government.

The district court granted defendants' respective motions for summary judgment and denied the city's motion to dismiss as moot.  Agreeing with the analysis in Totten, the court concluded that § 3729(a)(2) contains a presentment requirement and that Farmer had failed to satisfy it.  The court also held that Farmer had failed to produce evidence that the city and HAUL had entered into an agreement to get a false or fraudulent claim paid or approved by the federal government, so the court dismissed the § 3729(a)(3) claim with prejudice.

## III.

We review a summary judgment de novo under Federal Rule of Civil Procedure 56.  See, e.g., TIG Ins. Co. v. Sedgwick James, 276 F.3d 754, 759 (5th Cir. 2002).  A summary judgment will be affirmed "only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the light most favorable to the non-movant, 'show that there is no genuine issue as to any material fact.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).  Though the "court must draw all justifiable inferences in favor of the non-moving party," a genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

"[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial" and "man-

---

[5] HAUL also argued that because HUD's and the EHRP's standards for required documentation were vague, HAUL's submissions were not "false," because they were based on a good faith, reasonable interpretation of those standards.  HAUL likewise argued that any alleged misstatements were immaterial.

dates the entry of summary judgment" for the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." TIG Ins., 276 F.3d at 759 (quoting Celotex, 477 U.S. at 325). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Id.

The district court held that § 3729(a)(2) implicitlySSas § 3729(a)(1) does explicitlySScontains a presentment requirement. The court also rejected Farmer's contention that even if there is such an implicit presentment requirement, it was satisfied by the EHRP's post-disbursement audit requirement. The court held that because the allegedly false documents were not submitted to HUD at the time of, or in conjunction with, the city's use of federal funds, there was no presentment under the FCA. The court finally held that there was insufficient evidence from which a reasonable jury could find a conspiracy between the defendants, so it granted summary judgment on Farmer's § 3729(a)(3) claim. Farmer contends that each of these rulings is error.[6]

## IV.

## A.

The question whether § 3729(a)(2) contains a presentment requirementSS and if so, what that requirement entailsSSis both intricate and unsettled. The threshold question whether presentment is necessary under § 3729(a)(2) has di-

---

[6] The United States as amicus curiae similarly contends that the district court's rulings on § 3729(a)(2) are in error.

vided the courts of appeals.[7] The second question—what sort of presentment § 3729(a)(2) requires—is by and large unexplored. Accordingly, it is not surprising that there is uncertainty as to whether HUD's statutory obligation to audit its CDBG disbursements constitutes presentment for purposes of § 3729(a)(2), or whether instead the district court is correct that presentment under § 3729-(a)(2) requires a concurrence of payment and presentation of falsity.

We need not delve into the sinews of § 3729(a)(2), because Farmer's claim fails in a more fundamental way: She cannot show that defendants knew of any alleged falsehoods in the documents at issue. Without establishing knowledge of falsity, Farmer's § 3729(a)(2) claims are prima facie incomplete, so it is unnecessary to address whether the presentment requirement (if one exists) has been satisfied.[8]

## B.

Under § 3729(a)(2), a person is liable who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." § 3729(a)(2) (emphasis added). Though the FCA is plain that "proof of specific intent to defraud" is not necessary, see § 3729(b), that mens rea requirement is not met by mere negligence or even gross negligence.[9]

---

[7] Compare Totten (holding that presentment is required under § 3729(a)(2)) with United States ex rel. Sanders v. Allison Engine Co., 471 F.3d 610 (6th Cir. 2007) (presentment not required), cert. granted, 128 S. Ct. 491 (2007).

[8] Though the district court granted summary judgment based on lack of presentment, "[i]t is an elementary proposition, and the supporting cases too numerous to cite, that this court may 'affirm the district court's judgment on any grounds supported by the record' . . . ." Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp., 509 F.3d 216, 221 (5th Cir. 2007) (citing Sojourner T v. Edwards, 974 F.2d 27, 30 (5th Cir. 1992)).

[9] See United States v. Krizek, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (noting that at least "aggravated gross negligence" or "an extreme version of ordinary negligence" is necessary un-
(continued...)

Instead, "knowingly" is defined in the FCA as including three separate meanings: (1) "actual knowledge"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information." § 3729(b). Given this definition of "knowingly," courts have found that the mismanagementSSaloneSSof programs that receive federal dollars is not enough to create FCA liability.[10]

## C.

Farmer failed to present specific evidence from which a reasonable jury could find that defendants acted with knowledge, as defined by the FCA, that any document at issue contained false and fraudulent information. For instance, in her response to HAUL's motion for summary judgment, Farmer argued that she "adduced ample evidence that the Urban League got claims paid based upon overstatements of quantities needed and used, in order to make the payments look legal when they were notSSin order to deceive auditors." R. 2331.[11] She then contended that "[i]t is for a jury to infer whether one or more of the amounts paid to the Urban League were based upon actual knowledge, or deliberate ignorance, or reckless disregard of the truth or falsity of the claims." Id.

On closer review of the record, however, it becomes apparent that no reasonable jury could conclude that the knowledge requirement has been met.

---

[9] (...continued)
der the FCA). Accord United States ex rel. Aakhus v. Dyncorp, 136 F.3d 676, 682 (10th Cir. 1998); Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478 (9th Cir. 1996); UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 792 n.15 (1999).

[10] See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 789 (4th Cir. 1999) ("The allegations . . . amount to no more than allegations of poor and inefficient management of contractual duties. The district court was correct in holding that poor . . . management is not actionable under the False Claims Act."); United States ex rel. Aflatooni v. Kitsap Physicians Servs., 163 F.3d 516, 526 (9th Cir. 1999) (The "allegations regarding . . . deficient auditing procedures is not evidence of fraud, although it may suggest that KPS was negligent . . . .").

[11] The citations beginning with "R." are references to pages in the record.

Though her pleadings are not especially plain on this point, our examination of the record shows the evidence produced by Farmer as to defendants' mens rea is as follows:

! "[T]here had been earlier instances of overcharges, and prior monitoring of the [EHRP]. . . ." R. 2332.

! Records of competitive bids from third-party contractors were required but were frequently missing. R. 1754, 2452-54.

! In a HUD official's opinion, many third-party contracts and reimbursement requests did not have "an acceptable cost breakdown." R. 1753, 2467.

! There was evidence that "contractors were just assigning prices to accommodate the amount of the grant," because the requests were equal to the maximum value permissible under the EHRP. R. 1753.

! The mistaken estimates were uniformly over-estimates. See R. 2331.

! There were certificates of completion wherein a notary certified that the documents were subscribed before the notary that were, in fact, unsubscribed. See R. 2424-25, 2456.

! Some third-party contracts allowed administrative expenses of at least 20% and possibly more, despite a HUD regulation that capped administrative expenses at 20%, and, contrary to HUD regulations, these administrative expenses were expressed as a fixed percentage of costs. See R. 2455.

! Because of inadequate oversight, overcharges, failure to adjust costs to correct excessive estimates, and charges for materials not provided, HUD suspended its participation with the EHRP, and the city agreed to reimburse HUD for overpayments made to third-party contractors and to correct unacceptable work. See, e.g., R. 1747-48, 1753, 1789.

From this circumstantial evidence, Farmer claims that the question whether defendants acted with knowledge should go to the jury, noting that

"[c]ircumstantial evidence can be as convincing as lipstick on your collar (or Monica Lewinsky's blue dress)." R. 2332. Though in certain cases, circumstantial evidence can be sufficient to withstand summary judgment, this is not such a case, in light of how a reasonable jury would esteem the available evidence.

A jury would necessarily think carefully about the context in which defendants' conduct occurred. Cf. McKethan v. Tex. Farm Bureau, 996 F.2d 734, 743 (5th Cir. 1993). It would, for instance, consider the relative ease by which defendants would have been able to determine the nature and extent of the alleged overcharges when the alleged overcharges were happening. To decide whether defendants were negligent or, as required by the FCA, worse than negligent, the jury would evaluate defendants' conduct in light of the opinion of HAUL's expert that many factors can affect measurements in residential repair projects, including the style of home, overages, residential conditions, and the contractor's expertise, and changes to the property that are not reflected in the Harris County Appraisal District's estimates. See R. 1171, 733-39.

These additional factors would suggest to the jury that even if the reimbursement forms submitted by the third-party contractors in fact contained false statements, it would have been relatively difficult for the defendants to ascertain that fact. Granted, defendants might have been negligent in failing to identify the overcharges, but the jury would conclude that the presence of these additional factors tends to mitigate against finding that defendants acted knowingly, especially given that Farmer produced no countervailing evidence that the factors set forth by HAUL's expert were not reasonably part of the construction process.

Then, the jury would consider how blatant were defendants' alleged violations of the regulations. After all, if the violations were particularly brazen, the jury would be more likely to conclude that defendants were intentionally or recklessly violating the regulations. From that it is but a small step to conclude that defendants were intentionally or recklessly misusing CDBG funds. On the

other hand, if the regulations were relatively opaque, and if the infractions were relatively minor or technical, the jury would be inclined to believe it less likely that defendants were "knowingly" acting for purposes of the FCA.[12]

A jury would conclude that the regulatory environment in which defendants were operating was not nearly as cut-and-dry as Farmer's proffered evidence suggests. Indeed, during deposition, HUD officials admitted that there is nothing in HUD's CBDG regulations that objectively defines what is a reasonable cost. See R. 1171, 1304. With this information in mind, the jury would be considerably less likely to infer that the alleged overcharges and other misstatements show that defendants acted "knowingly" for FCA purposes.

At the same time, the jury would consider whether the alleged violations were serious enough that they are not the sort of errors that would occur negligently; for example, a mere ministerial error does not carry the same evidentiary weight as does a violation of a more important rule. See, e.g., Southland Mgmt., 326 F.3d at 682 (noting that there is no FCA liability for "'mere' . . . regulatory noncompliance"). With this in mind, a jury would put little weight on the fact that some documents were notarized without the full slate of required signatures. Though abuses of the notarization process are not trivial, no reasonable

---

[12] See United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Jones, J., specially concurring) (noting that "claimants [do not] 'knowingly' present[] false claims where there were instances of 'mere' contractual or regulatory noncompliance," because the "FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them.") (quoting United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir.1999)); see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) ("We agree with the district court that claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA."). In fact, if the regulations were thoroughly unclear, as a matter of law, the FCA's knowledge and falsity requirements have not been met. See Southland Mgmt., 326 F.3d at 684 (Jones, J., specially concurring) ("Where there are legitimate grounds for disagreement over the scope of the contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim.").

jury would conclude from such evidence that defendants knowingly or recklessly were perpetuating a fraud on the United States. The logical connection between these omissions and knowingly submitting false claims is too attenuated.

The jury would similarly evaluate evidence that some contracts with third-parties contained improperly structured administrative expenses. Such evidence might suggest that the EHRP was negligently administered, but that is not the type of error that could reasonably support an inference of reckless disregard for the truth, much less deliberate ignorance or actual knowledge. In the absence of additional specific information that casts a sinister shadow onto that evidence, no reasonable jury could consider it sufficient to meet the FCA's demanding knowledge requirement.

The evidence that most strongly favors Farmer is the evidence concerning inadequate cost breakdowns, non-competitive bidding, and reimbursement requests and estimates that coincided exactly with the maximum amount permissible under the EHRP. Again, however, the jury would consider the context in which defendants were operating.

For example, though a HUD official was of the opinion that the cost breakdowns were inadequate, our survey of the (at times difficult to follow) voluminous documentary evidence presented by Farmer in support of her opposition to summary judgment indicates that the breakdowns were not completely bereft of relevant information; nearly all contained at least some coherent categorization of the type and quantity of the allegedly necessary materials. Although the jury could find that defendants were negligent in failing to demand a more thorough breakdown and that the breakdowns that defendants accepted may not have complied with all applicable rules and regulations, it is significant that the documents were not totally barren in this regard. No reasonable jury could find the knowledge requirement met based on this evidence alone.

Similar thinking would drive the jury's assessment of the fact that many

reimbursement requests were for the exact maximum monetary value permissible under the EHRP. At first blush, that evidence might lead one to conclude that defendants were recklessly rubber-stamping whatever the third-party contractors submitted. But the jury also would consider the realities of the construction industry, especially for those involved in projects like the EHRP with specific cost ceilings.

If a program permits only projects with a value of up to $20,000, a third-party contractor who believes that the reasonable value of a project is, for example, $22,000 mightSSunder the theory that a bird in the hand is worth two in the bushSSbid and receive reimbursements for $20,000, even though that would mean perhaps not making as much as the market would ordinarily bear on a like project. But instead of harming the national treasury, such a practice would allow the government to maximize the value it receives, while permitting legitimate third-party contractors to be awarded projects they would not otherwise be eligible to receive. The jury would thus expect a disproportionate number of reimbursements to be for the exact amount of the regulatory maximum.

It is possible that a dishonest third-party contractor would inflate its numbers to reach the maximum, just as an honest one would deflate its numbers. Defendants, therefore, may have been negligent in failing to investigate adequately, but the mere fact that many reimbursements were for the maximum value is insufficient evidence from which the jury could find defendants liable under the FCA.

## D.

When weighing Farmer's argument that in many cases it does not appear that competitive bidding occurred, that a HUD official stated that such bids should have taken place, and that the Texas Government Code arguably requires competitive bidding for these third-party contracts, the jury would neces-

sarily assess how obvious it should have been to defendants that they were violating the regulations: the more obvious the violation, the more rational the inference that defendants were acting knowingly. Here, however, the violation is not obvious at all.

As support for her claim that bidding regulations were violated, Farmer argued in her opposition to summary judgment that Texas Government Code § 2155.063 mandates competitive bidding. R. 2452-54. That point was not addressed by defendants, but it is far from certain that Farmer's interpretation of the Code is correct.

First, the Code states that "a purchase of or contract for goods or services shall, whenever possible, be accomplished through competitive bidding." § 2155.063. Thus, on its face this section is somewhat ambiguous, because it includes the limiting phrase "whenever possible." The presence of this ambiguity makes it less likely that the jury would conclude that a violationSSif, indeed, there was oneSSof the provision means that defendants acted with reckless disregard for the truth, especially given the limited caselaw interpreting the provision.[13]

Second, and of more significance, it is also uncertain on its face whether that provision of the Code applies to contracts by a non-governmental organization, like HAUL, with third-party contractors, or if it applies only to contracts by the government itself. Even if it does apply to non-governmental contracts that are paid with public money, defendants could have believed, perhaps negligently, that it did not apply to contracts like those at issue here. Given this uncertainty, and given that HUD's requirement of competitive bidding is tied to

---

[13] We know of only one case that even mentions this section of the Code, Tsumi, Inc. v. Tex. Parks & Wildlife Dep't, 23 S.W.3d 58 (Tex. App.SSAustin 2000, pet. denied), and that case is not on point.

Texas's standard,[14] the jury would find that any failure by defendants to comply with a bidding requirement is at most evidence of negligence.

## E.

Finally, the jury would necessarily consider the proffered evidence as a whole. Given that, in context, all the other evidence mustered by Farmer to support knowledge of falsity is of limited probative valueSScertainly insufficient for a reasonable jury to find culpability greater than negligenceSSthe jury would have to consider whether the evidence of missing bids, coupled with the cumulative effect of the other evidence, might be enough to find that defendants had one of the requisite mental states. Though the combined persuasive force of these individual pieces of evidence is more compelling than any in isolation, the jury could not find liability under these facts, because of the FCA's onerous mens rea requirement of, at a minimum, reckless indifference.

## V.

For the reasons set forth in the district court's opinion, we agree that Farmer's claim that defendants have violated § 3729(a)(3) is similarly lacking in specific evidence sufficient to withstand summary judgment. By the words of that subsection, a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to FCA liability. To prove a conspiracy, Farmer ultimately must be able to show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by HUD and (2) at least one act performed in furtherance of that agreement. See United States ex rel. Graves v. ITT Educ. Servs., Inc., 284 F. Supp. 2d

---

[14] See 24 C.F.R. § 85.36(b)(1) ("Grantees and subgrantees will use their own procurement procedures which reflect applicable State and local laws and regulations, provided that the procurements conform to applicable Federal law and the standards identified in this section.").

487, 509 (S.D. Tex. 2003). As part of that showing, Farmer must demonstrate that defendants "shared a specific intent to defraud the [G]overnment." United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys., 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (quotation and citation omitted). As with § 3729(a)(2), negligence alone cannot satisfy § 3729(a)(3).

For purposes of summary judgment, Farmer must show specific evidence that would allow a reasonable jury to find that these conditions have been met; this she cannot do. The evidence she has presented to support a conspiracy is that, as stated in her opening brief on appeal, "documentary evidence established that [defendants] jointly signed and submitted claims for payment that contained false and fraudulent information." She also notes that "[i]n some cases claims that were signed by both City and HAUL had been notarized but not signed by the contractors. In other cases, the jointly submitted Request's [sic] for Payment were blank where the amounts were to have been shown." At the same time, Farmer contends that "[t]here is no indication . . . that . . . the City question[ed] or raise[d] any objection to any information submitted by HAUL on which the requests for payment were based." From this, she claims that "at least an inference of tacit agreement" has been raised.

That is not enough to raise an inference of even a tacit agreement. That both defendants signed certain forms in arguably suspicious circumstances does not demonstrateSSor even reasonably intimateSSa shared unlawful objective to obtain payment on false claims. To conclude otherwise requires this court to accept that a reasonable jury could infer that, when they signed the forms, both defendants were actually aware of the suspicious circumstances and were not merely negligent.

From that inference, a reasonable jury then would have to infer that both defendants were, in fact, conscious of the false claims, not just the suspicious circumstances. But even those two inferences would not be enough. The reasona-

ble jury would then have to infer from that consciousness that both defendants had agreed§§at least tacitly§§on a plan to defraud the government.

Even viewing the proffered evidence in the light most favorable to Farmer, we cannot accept that any reasonable jury could find that the mere existence of joint signatures and arguably suspicious circumstances is enough to bear the heavy burden Farmer wishes it to support. We thus agree with the district court that the fact that the city signed and approved HAUL's requests for payment does not establish any kind of agreement between the city and HAUL to commit fraud, nor does it show any specific intent to defraud the United States.

And, again as correctly observed by the district court, the fact that the city may have accepted improper documentation from HAUL does not establish that defendants agreed to engage in fraudulent conduct. Viewed again in the light most favorable to Farmer, this evidence suggests, at best, that defendants negligently administered their respective duties under the EHRP. Negligence, however, is not conspiracy. Defendants are entitled to summary judgment on Farmer's § 3729(a)(3) claim.[15]

In summary, because Farmer has failed to produce specific evidence from which a reasonable jury could find that defendants acted with knowledge of falsity in any relevant document or that there was a conspiracy between defendants, the summary judgment is AFFIRMED.

EDITH H. JONES, Chief Judge, concurring in part and dissenting in part:

---

[15] Because we decide the § 3729(a)(3) claim based on insufficient evidence, we need not consider whether the absence of liability under § 3729(a)(2) requires a finding of no conspiracy under § 3729(a)(3).

For procedural and substantive reasons, I respectfully dissent from the majority's holding on Farmer's § 3729(a)(2) claim.[1] The parties argued this claim primarily (and before this court, exclusively) in terms of whether § 3729(a)(2) implies a presentment requirement. The majority bypasses both the original source and presentment issues and instead affirms summary judgment based on an undeveloped argument that there was no "knowing" misuse of federal funds in this case. Though the majority fails to make this clear, only one of the defendants raised this "scienter" issue below, the district court did not rule on it and neither defendant has argued it to this court. The scienter issue has not been sufficiently preserved, or the record adequately developed, to justify the majority's decision on this point. Worse still, the evidence of record strongly suggests that someone treated the federal repair funds as a honey pot rather than a public trust. Yet the majority goes out of its way to minimize palpably suspicious circumstances.

1. The majority's assertion that we "may affirm the district court's judgment on any grounds supported by the record" is an oversimplification of the rule. Both the nature of appellate review and this circuit's precedent require a more cautious approach. As this court explained en banc in United States v. Brace, "we are a court of review, not of original error. . . . we do not craft new

---

[1] I concur in the majority's judgment as to Farmer's conspiracy claim under § 3729(a)(3). Farmer has not produced sufficient evidence showing that both defendants agreed on a plan to defraud the government.

issues or otherwise search for them in the record." 145 F.3d 247, 255-56 (5th Cir. 1998). Rather, "[i]t is for the parties, those who have a stake in the litigation, to decide which issues they want to pursue at trial and on appeal." Id. at 256.

The defendants in this case decided how best to carry their respective burdens in pursuit of summary judgment and success on appeal, but it turns out those tactical decisions are of little consequence. The majority affirms summary judgment for both defendants on grounds that the City never raised at any stage, and neither defendant pursued before this Court.[2] HAUL did raise the issue below, but prevailed on the presentment issue and chose to place all its eggs in the same basket on appeal. To affirm summary judgment for HAUL on grounds that it has abandoned may be justifiable in theory, but to extend that benefit to the City is nothing short of a windfall, a sua sponte summary judgment on appeal.

Generally, this court may affirm summary judgment on grounds not relied on by the district court. But this is not a complete statement of the rule; in most cases we require, at a minimum, that those grounds be raised before the district court. Leverette v. Louisville Ladder Co., 183 F.3d 339, 342 (5th Cir. 1999) ("This

---

[2] The majority's representation that "defendants — primarily HAUL — argued" the lack of scienter below is simply incorrect. One defendant, HAUL, raised this issue below. The City never did.

19

Court will not consider an issue that a party fails to raise in the district court absent extraordinary circumstances.").[3] As Judge Garwood carefully explained in FDIC v. Laguarta:

> This Court has clearly held, however, that it will generally not consider a new ground on appeal raised by an appellant in opposition to summary judgment. The same should apply to new grounds raised by an appellee in defense of summary judgment where the parties were not afforded an opportunity to develop the issue below, and it was not implicit or included in the issues or evidence tendered below, so that the party was not on notice of the need to meet it, and the record appears not to be adequately developed in that respect.

939 F.2d 1231, 1240 (5th Cir. 1991) (internal citations omitted). As Judge Garwood acknowledged, there may be exceptions to this rule, "if the issues were implicit or included in those raised below or the evidence in support thereof, or if the record appears to be adequately developed in respect thereto." Id. This recognized exception was properly invoked by the court in FDIC v. Lee, 130 F.3d 1139, 1142 (5th Cir. 1997). Lee, after a thorough analysis, affirmed summary judgment on a purely legal ground that was raised in the Complaint, was uncomplicated, and had been completely developed for appellate review. Id. at 1142-43.

---

[3] Even in opinions that recite the majority's abbreviated version of this rule, there is the implication that the district court at least had the opportunity to pass judgment on the issue. See, e.g., Mangaroo v. Nelson, 864 F.2d 1202, 1204 n.2 (5th Cir. 1989) (Smith, J.) (stating that the court may affirm for any grounds in the record, "even if those grounds were rejected by the trial court"); Hoyt R. Matise Co. v. Zurn, 754 F.2d 560, 566 (5th Cir. 1985) (stating that the court may affirm on any ground, "including one rejected or ignored in the lower court").

This case is not like Lee: first, the "knowingness" issue has not been fully developed and is not amenable to simple resolution on appeal. The parties spent no time arguing scienter to this Court, and as demonstrated infra, the majority's unassisted review of a cold record is woefully incomplete. The City, having failed to put Farmer on notice that it was attacking the scienter element of her claim, is simply not entitled to summary judgment on the issue. Nor am I persuaded that a judgment in favor of HAUL on reckless disregard exonerates the City with regard to its own responsibilities in administering the EHRP. The City — which should bear the burden on its own motion for summary judgment — chose not to raise the issue. Yet the majority, without explaining what authority it has to do so, simply "cuts the City in" on HAUL's victory.[4]

Further, unlike Lee's purely legal question of statutory construction, the scienter finding in this case turns on a morass of factual distinctions that — as the majority's "on-the-one-hand, on-the-other-hand" analysis demonstrates — are far from clear-cut. Perhaps this sprawling factual determination is an exception to the rule that we limit ourselves to the issues the parties have raised on appeal. But the majority's failure properly to articulate that rule, much less explain how an exception applies, serves only to confuse the law. This decision

---

[4] This is even more unexpected in light of the City's argument in its motion to dismiss that Farmer was not an "original source" because HUD was already "squarely on the 'trail of fraud' against [HAUL]." The City never argued this wrongdoing would have been difficult to detect; rather, it submitted evidence showing the "very same types of fraud" Farmer identified were readily apparent to the HUD inspectors who were looking into the EHRP.

does not do justice to the governing legal standard or to the parties before this court.

2. In addition to these procedural objections, I dissent from the majority's substantive resolution of the scienter question. To resolve this fact issue as a matter of law, a court must reach a conclusion that is beyond dispute by all reasonable jurors. The majority falls short of this standard with its protracted and unusual — yet ostensibly inescapable — weighing and re-weighing of a laundry list of suspicious transactions that HAUL and the City approved. The majority's account of what a jury would "expect" to find in the evidence, or what sort of "thinking would drive the jury's assessment" is not only unpersuasive, but highlights that the majority is performing its own fact-finding. The majority also tips its hand with a lengthy prognostication as to what facts a jury "would put little weight on," or what a jury would be "less likely to infer" or "less likely to conclude." I have never seen an appellate opinion that purported to resolve a factual question like this, on a record which raises so many questions, in a patently "juri-fied" way. I cannot agree that all reasonable jurors would have no choice but to follow the majority's serpentine course through the evidence and reach its conclusion.

My disagreement is sharpened by the majority's gross understatement of the evidence Farmer presented on summary judgment. HUD did not simply conclude, as the majority states, that "many" third party contracts lacked an

acceptable cost breakdown. Rather, the HUD inspector chose 62 files at random and found that "none of the contracts contained an acceptable cost breakdown." R. 1753, 1788 (emphasis added). The majority makes it look as if there were problems in only a handful of cases — all with reasonable, legitimate explanations. To the contrary, the evidence indicates that, program-wide, the EHRP was unsupervised, rife with fraud, and effectively unreviewable due to an obvious lack of fundamental documentation. Based on 62 sample files and 26 on-site visits, HUD made the following observations that the majority chooses to overlook:

! "Across the board," the work write-ups were "too general and loosely written to allow a reviewer to conclude that equipment and/or materials are acceptable, quantities are accurate, and costs are reasonable." R. 1788.

! "None of the files reviewed contained a Scope of Work to describe what was to be done and how it would be done . . . . This information is critical in estimating costs." R. 1788 (emphasis added).

! "Change orders" — alterations to a bid after a contract was signed — did not show justification for the changes. R. 1788.

! None of the files contained state-required forms for termite inspection and treatment, even though this was listed as a cost item. R. 1788.

! "All files" contained too many stand-alone and lump sum estimates

23

without a reasonable explanation. "None of the contracts contained an acceptable cost breakdown . . . . it appears that contractors were just assigning prices to accommodate the amount of the grant." R. 1788 (emphasis added).

! "Across the board," on-site visits revealed "huge differences" between the estimates of materials needed and the actual materials applied, as well as "obvious evidence of poor on-site supervision and inspections." R. 1789.

! On-site visits verified that "on numerous occasions contractors collected payments for units of materials that were not applied." R. 1789.

! There was "no evidence that the contractors made any attempt to adjust costs to correct excessive estimates." R. 1789 (emphasis added).

! In light of these conspicuous overcharges, the HUD inspector observed that "there is no evidence that the subrecipients managing the program or the City of Houston questioned the contractors' actions and overpayments — they failed to exercise any quality control." R. 1789 (emphasis added).

This is only a sample. Farmer submitted over 500 pages of exhibits including reports, documents, and photographs that depict blatant misrepresentations and obviously substandard work. On two occasions it appears EHRP funds were used to make down payments on newly-constructed homes — an admittedly impermissible expenditure. The City denies this took

place (R. 2303, 2306), but the record contains a check to Habitat for Humanity in the amount of $20,000 (R. 1941); a $20,000 invoice from Habitat for Humanity reading "downpayment assistance for a home" (R. 1943); a request for payment detailing another $15,000 check to Habitat for Humanity (R. 2017); and a note from a City inspector on this second property that reads "Upon review of the file it was noticed that the homeowner received $15,000 in down payment . . . ." R. 2276. Farmer also presented evidence that $6,700 in program funds were spent to fill in a swimming pool — another facially impermissible expenditure that the City denies. (R. 2304). Yet the record contains a request for payment to "ABC Drainage" in this amount (R. 2110), and the City's re-inspection report (the very basis for its denial) details this expense as "swimming pool fill-in." R. 2279.

In light of the evidence in the record, the majority's analysis is not only unwieldy, it is untenable. The record belies the majority's assertion that it would have been "relatively difficult" for the defendants to recognize these overcharges. Rather, the evidence suggests the defendants may have turned a blind eye to patently false submissions, and, at best, "failed to exercise any quality control at all." As more than one court has noted, the FCA reckless disregard standard "is intended to reach the 'ostrich-with-its-head-in-the-sand' problem where government contractors hide behind the fact that they were not

personally aware that such overcharges may have occurred."[5]

If the majority is holding out for a "smoking gun" admission of fraudulent intent, this would vitiate the statute's provision that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). At a minimum, the FCA requires reckless disregard of truth or falsity. As noted in one opinion cited by the majority, "failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard." UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 794 (1999) ("It is apparent that this reckless disregard standard prevents defendants from simply pointing to confusion over invoices and billing records as a complete defense."). There is enough in this record to allow a jury to determine whether something worse than gross negligence led the City and HAUL to approve so many obviously improper expenditures. There is certainly much more in the record than the majority has accounted for. Given the evidence of clear and pervasive fraud in this case, the majority's finding that the defendants cannot be found culpable of anything worse than "mismanagement" is hardly credible, much less beyond reasonable debate.

I respectfully dissent.

---

[5] United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997) (quoting 132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman)); see also UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 794 (1999) (similar).