REVISED July 15, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 9, 2009

Charles R. Fulbruge III
Clerk

No. 08-20194
No. 08-20306

United States of America, ex rel; ALFRED J LONGHI, JR

Plaintiff - Appellee

v.

UNITED STATES OF AMERICA

Intervenor - Appellee

v.

LITHIUM POWER TECHNOLOGIES INC; MOHAMMED ZAFAR A MUNSHI

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

In 2002, Alfred J. Longhi, Jr. ("Longhi"), a former employee of Lithium Power Technologies, Inc. ("Lithium Power"), filed a qui tam suit under the False Claims Act ("FCA"), 31 U.S.C. § 3729, against Lithium Power and its president, Mohammed Zafar A. Munshi (jointly, "the Defendants"). In 2005, the United

States of America intervened in the suit. Longhi and the United States of America (jointly, "the Government") alleged that the Defendants engaged in an elaborate pattern of false statements to secure research grants from the federal government. Ultimately, the district court granted the Government's motions for summary judgment on liability and damages. The court awarded nearly $5 million in damages and penalties, and the parties voluntarily dismissed the remaining claims in the lawsuit. The Defendants moved for reconsideration, and the district court denied that motion and entered a final judgment. Longhi then filed a motion for statutory attorneys' fees, which the district court granted in full. The Defendants now appeal the district court's finding of liability, award of damages, and award of attorneys' fees to Longhi. We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1982, Congress established the Small Business Innovation Research ("SBIR") program. The goal of the SBIR program is to provide research assistance to small businesses in order to maintain and strengthen the competitive free enterprise system and the national economy. See 15 U.S.C. § 638(a). Congress directed each federal agency with a research and development budget exceeding $100 million to establish a SBIR program and to provide some fraction of its budget to small businesses. 15 U.S.C. § 638(f). Each federal agency with a SBIR program was charged with selecting awardees for its SBIR funding. 15 U.S.C. § 638(g).

The Department of Defense ("DoD") administers a SBIR program in which twelve military components participate. The DoD identifies specific research projects that it is interested in funding and allows small businesses to seek SBIR grants for these projects. DoD's program solicitations explicitly state that knowingly and willfully making any false, fictitious, or fraudulent statements or representations may be a felony under the Federal Criminal False Statements

Act, 18 U.S.C. § 1001. After receiving proposals, the DoD selects those that they perceive offer the best value to the government and nation. The merits of a SBIR proposal are in part measured by an examination of the applicant's qualifications. The DoD specifically considers the: (1) key personnel available to perform the research, (2) facilities and equipment available to the applicant, and (3) scope of any previously funded work performed by the applicant that may be similar to that proposed. When the DoD selects a proposal for funding, the agency enters into a contract with the recipient that governs the terms under which the funds are disbursed. The DoD generally does not verify all of the information submitted in a proposal, and it depends heavily on the integrity of SBIR applicants.

Under the DoD's SBIR program, there are two types of SBIR grants. A Phase I research grant is intended for the recipient to determine the scientific, technical, and commercial merit and feasibility of ideas submitted under the SBIR program. These grants typically range from $60,000 to $100,000 and cover at most a nine-month period. If the DoD determines that the Phase I grant recipient demonstrates that future research may potentially yield a product or process of continuing importance to the DoD and the private sector, it can award a Phase II grant. Phase II grants are only available to applicants who previously received a Phase I award and are aimed at research or a research and development effort. A Phase II grant is expected to produce a well-defined, deliverable prototype and typically ranges from $500,000 to $750,000 over a two-year period. During Phase III of a research and development project, the applicant is expected to obtain funding from the private sector or non-SBIR government sources to develop the prototype into a viable product.

In 1998, Munshi founded a small business, Lithium Power. Lithium Power designs and manufactures specialized lithium-based batteries for

commercial and government applications. Munshi is Lithium Power's majority shareholder, president, chief executive officer, and chairman of the board.

The Defendants submitted four proposals–two to the Ballistic Missile Defense Office ("BMDO") and two to the Air Force–to receive Phase I and II SBIR grants for research that could lead to the development of very thin rechargeable batteries. In connection with the four SBIR grants, the Defendants submitted more than fifty invoices to the BMDO and the Air Force for payment and received more than $1.6 million.

Lithium Power's four SBIR proposals contained the false claims at issue in this case. In 2000, the relator[1] in this action, Longhi, joined Lithium Power as Vice President for Sales and Marketing. During 2001 and 2002, Longhi began to suspect that the Defendants were defrauding the federal government. He began documenting what he believed was the Defendants' pattern of fraudulent conduct and investigating a means to stop the fraud. In August 2002, Longhi began working with counsel to prepare his FCA case, and he met with the Government on September 20, 2002. One month later, Munshi told Longhi that "due to tough economic times" Longhi would be placed on a three-day work week beginning November 2, 2002, and receive a 40 percent decrease in compensation. Longhi informed Munshi that he could not afford the extreme decrease in pay and needed to sell his Lithium Power stock to raise capital. On November 4, 2002, Munshi told Longhi that he would be laid off within two weeks and offered to buy Longhi's stock for between $80,000 and $90,000. On November 6, 2002, Munshi explained that the stock sale would be the subject of a more detailed agreement.

---

[1] Suits to collect statutory damages and civil penalties under the FCA may be brought by the Attorney General or by a private person, known as a relator, in the name of the United States. An action brought by a relator is commonly referred to as a qui tam action. See 31 U.S.C. §3730(a) and (b)(1).

On November 18, 2002, Longhi filed a qui tam action against the Defendants to recover statutory damages and civil penalties under the FCA. On November 21, 2002, Munshi provided Longhi with a copy of the stock sale agreement. On November 25, 2002, Munshi laid off Longhi. The agreement for the sale of stock contained a provision stating that Longhi personally agreed to release the Defendants from pending claims or lawsuits and agreed not to sue the Defendants for the loss of Longhi's job. The original covenant also disallowed Longhi to sue "for any other reason," but Longhi objected to this language and it was changed to "for any other matter prior to execution of" the agreement to sell the stock. The agreement was executed by the parties on November 29, 2002, eleven days after Longhi filed suit against the Defendants. Munshi's wife paid Longhi $80,000 for the stock.

Longhi's qui tam action accused Lithium Power of double billing and of billing for work that was never completed in connection with twenty-one different contracts. The United States investigated and intervened in 2005 in connection with Longhi's allegations pertaining to fraudulent billing on the four SBIR grant proposals. The Defendants denied Longhi's allegations, and the Government failed to uncover evidence that supported Longhi's allegations.

On November 9, 2006, the Government filed a motion for partial summary judgment as to liability and argued that the undisputed record evidence demonstrated that the Defendants had, at a minimum, shown a reckless disregard for the truth regarding many of the representations in their four SBIR grant proposals. On December 22, 2006, the Defendants filed a cross-motion for partial summary judgment. The district court granted the Government's motion for partial summary judgment on March 23, 2007. The district court stated that fraudulently inducing the Government to provide funding for a project could give rise to FCA liability, even if the statements on particular invoices submitted in

connection with the project were true. The district court explained that the Government needed only to demonstrate that the Defendants either were willfully blind to the falsity of the statements or acted with an extreme form of negligence in making those statements.

In determining the merits, the district court examined five separate categories of statements in the Defendants' SBIR proposals. First, the district court explained that the Defendants' BMDO Phase II proposal falsely stated that Lithium Power was incorporated in 1992. Second, the district court concluded that the Defendants misrepresented the key personnel who would be conducting the research work in three of the four proposals. The district court noted, however, that the misrepresentations as to key personnel resulted from mere negligence, and the court discounted this evidence. Third, the district court determined that Lithium Power knowingly falsified statements regarding its facilities and equipment. Fourth, the district court concluded that the Defendants acted with reckless disregard to the falsity of statements by representing that Lithium Power had cooperative arrangements with the University of Houston and Polyhedron Laboratories. Fifth, the district court noted that the Defendants failed to disclose in its Air Force SBIR grant proposals that Lithium Power had previously undertaken related work in connection with a BMDO SBIR grant.

The district court then assessed whether these false statements, omissions, and misrepresentations were "material." The district court explained that under the FCA materiality requires that the false statement in question have a natural tendency to influence or be capable of influencing a decisionmaker. The district court concluded that the Government offered ample summary judgment evidence that the misrepresentations were actually material.

The Government then moved for summary judgment on damages. The district court held that the Government suffered damages in the amount of the grants it paid out to the Defendants in connection with their deceptive proposals–$1,657,455. The court tripled that amount, as required by the FCA, and awarded $4,972,365 in damages. The district court rejected the Defendants' contention that the damages should be reduced to reflect the benefit the United States received from the battery research that Lithium Power performed.

The parties stipulated to a voluntary dismissal of the Government's remaining claims and the Defendants' counterclaims without prejudice. Longhi's claims regarding the other seventeen contracts, that the Government did not intervene in, were among those dismissed. The district court entered final judgment for the Government based on that stipulation. The Defendants appeal the district court's finding of liability and damages award.[2]

On February 5, 2008, Longhi filed a motion for statutory attorneys' fees and final judgment. On February 25, 2008, the Defendants objected to Longhi's motion on a variety of grounds. Specifically, the Defendants stated that Longhi's motion for attorneys' fees failed to segregate the hours worked by his attorney on contracts and claims for which Longhi was not the prevailing party (i.e., the seventeen claims that were dismissed). The district court did not require Longhi to segregate the time his attorneys worked, and awarded Longhi the full amount of fees and costs that he requested–$283,765. The Defendants now also appeal the district court's award of attorneys' fees.[3]

---

[2] The Defendants' appeal regarding the district court's finding of liability and damages award is found in case No. 08-20194.

[3] The Defendants' appeal regarding the district court's award of attorneys' fees is found in case No. 08-20306.

## II. LIABILITY & DAMAGES AWARD

In appealing the district court's judgment finding the Defendants liable and awarding damages to the Government, the Defendants make four arguments. First, they allege that the district court erred in granting the Government's motion for partial summary judgment on the merits and finding that the Defendants violated the FCA. Second, the Defendants argue that the district court erred in granting the Government's motion for summary judgment with respect to damages and finding that the United States was entitled to recover the full amount of the grant awards paid out to the Defendants and to receive treble damages. Third, the Defendants allege that the district court erred in determining that their claims for release and indemnification from Longhi were against public policy and the text of the FCA. Finally, the Defendants contend that the district court erred by denying their summary judgment motions with respect to liability, damages, and the enforceability of the release and indemnification agreement. We discuss each of the Defendants' arguments in turn.

## A. Standard of Review

This Court reviews summary judgment orders de novo, applying the same standards as the district court. Langhoff Props., LLC v. BP Prods. N. Am. Inc., 519 F.3d 256, 260 (5th Cir. 2008). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). This Court resolves any doubts and draws all reasonable inferences in favor of the nonmoving party. Langhoff Props., 519 F.3d at 260.

## B. Violation of the False Claims Act

The district court granted the Government's motion for partial summary judgment on the merits and found that the Defendants violated the FCA. The Defendants argue that the district court erred because: (1) with regards to the BMDO Phase I grant, the misstatement of Lithium Power's date of incorporation does not give rise to liability under the FCA because it was an error that resulted from inadvertence or mere negligence and was not material; (2) with regards to the BMDO Phase I grant, statements regarding Lithium Power's facilities did not give rise to liability under the FCA, because the facilities were under construction when the Defendants made the statements and were completed by the time the government funded the proposal; (3) with regards to all four grant applications, the Defendants' statements concerning "cooperative arrangements," as opposed to "cooperative research arrangements," with the University of Houston and with Polyhedron were true and did not give rise to liability under the FCA, because they had a cooperative arrangement to use laboratories and scientific equipment, different than a cooperative research agreement to conduct certain research for a defined time period, and the statement was not material; (4) with regards to the BMDO Phase I and II grants and the Air Force Phase II grant, that statements regarding specific personnel indicated an expectation and wish to hire those individuals, but did not put forth that the individuals would necessarily accept an offer of employment; and (5) with regards to the Air Force Phase I and II grants, the Defendants assert that they properly disclosed the BMDO contracts to the Air Force when submitting their proposals, because they informed individual Air Force personnel of the BMDO SBIR grants. Thus, the Defendants request that we reverse and remand the district court's grant of the Government's motion for summary judgment.

The Government contends that the district court properly granted summary judgment in its favor after correctly concluding that the Defendants' false statements affected the SBIR grant selection process. The Government argues that the Defendants violated the FCA by submitting four SBIR proposals replete with false statements that gave the DoD the mistaken impression that Lithium Power was far more qualified than it actually was to engage in the proposed research. The Government argues that taken individually, "any one of the falsehoods would suffice to demonstrate a violation of" the FCA. At a minimum, the Government argues that the Defendants acted with a reckless disregard for the truth and presented false claims to the DoD, allowing Lithium Power to secure more than $1.6 million in research grants. The Government notes that the Defendants maintain that several of its misrepresentations were made inadvertently. In response, the Government argues that while subjective inadvertence is relevant to whether the Defendants had actual knowledge of the falsity of their statements, it is not relevant to the objective inquiry into whether the Defendants acted with reckless disregard of a statement's truth or falsity. The Government also argues that the Defendants' repeated false statements were material to the selection process. The Government explains that because an applicant's qualifications are a critical feature of the SBIR evaluation process, the Defendants' falsehoods had a natural tendency to influence and were capable of influencing the extremely competitive process for selecting small businesses to receive SBIR grants. The Government maintains that each false statement contributed to the impression that Lithium Power was better suited to carry out the proposed research than it actually was.

1. Legal Standard for Finding a Violation of the False Claims Act

An individual violates the FCA when he

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the

> Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a). We note that while the underlying fraud that invokes the FCA differs under § 3729(a), "the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995)) (internal quotation marks omitted).

> The FCA defines the terms "knowing" and "knowingly," which mean
>
> that a person, with respect to information—
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b). In addition to the requirements found in the text, our jurisprudence holds that a false or fraudulent claim or statement violates the FCA only if it is material. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) (stating that the FCA "interdicts material misrepresentations made to qualify for government privileges or services") (citation and quotation marks omitted)); see also Allison Engine Co., Inc. v. United States ex rel. Sanders, 128 S. Ct. 2123, 2126 (2008)[4]

---

[4] The Defendants argue that Allison Engine Co. is inapplicable to the instant case because false statements were made to a government contractor and not directly to the United States. We see no reason why the FCA would require a materiality standard in cases involving government contractors and not the United States.

(explaining that "a plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim").

We have consistently recognized the requirements discussed above, but we have not yet delineated a succinct test recognizing each element. The Fourth Circuit has concisely stated these various requirements in one test, which we adopt today: (1) whether "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (quoting Harrison, 176 F.3d at 788) (internal quotation marks omitted); see also United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1177-78 (9th Cir. 2006); Cf. United States ex. rel. Mikes v. Straus, 274 F.3d 687, 695 (2d. Cir. 2001) (utilizing a five-part test where a violation of the FCA is shown when an individual (1) makes a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing its falsity, and (5) seeking payment from the federal treasury).

### a. False or Fraudulent Statement

In the instant appeal, the Government alleges that the Defendants engaged in a fraudulent course of conduct by submitting false statements in the SBIR grant proposals. The Government does not allege that the Defendants submitted false claims for payment for each SBIR grant proposal. In certain cases, FCA liability may be imposed "when the contract under which payment is made was procured by fraud." United States ex rel. Willard v. Humana Health Plan of Texas, Inc., 336 F.3d 375, 384 (5th Cir. 2003) (citing Harrison, 176 F.3d at 787). This type of FCA claim is characterized as fraudulent inducement. Under a fraudulent inducement theory, although the Defendants' "subsequent

claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation, they, too, became actionable false claims." United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co., 491 F.3d 254, 259 (5th Cir. 2007) (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 543-44 (1943)).[5]

### b. Requisite Scienter

The Government contends that the Defendants' fraudulent conduct was "made or carried out with the requisite scienter." The scienter requirement comes from § 3729(b)'s definition of the terms "knowing" and "knowingly." We have explained that "[t]hough the FCA is plain that 'proof of specific intent to defraud' is not necessary, [the mens rea] requirement is not met by mere negligence or even gross negligence." United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 338 (5th Cir. 2008) (internal citation omitted). Thus, the Government must demonstrate the Defendants had (1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided when the Defendants fraudulently induced the BMDO and Air Force to award them the SBIR grants. See id. at 339.

---

[5] We note that Laird outlines a two part test "to succeed on a fraud-in-the-inducement theory under the FCA." Laird, 491 F.3d at 259. Under the Laird test the Government must prove that the Defendants (1) had no intention to perform according to the terms of the SBIR, and (2) obtained payments under the SBIR contract that it was not legitimately entitled. See id. (citations omitted). The second portion of this statement could be construed as requiring "outcome materiality," which is discussed in detail below. Laird, however, expressly declines to rule on the proper standard for assessing materiality. Id. at 261 (citation omitted).

c. Materiality

The Government next argues that the false statements in the SBIR grant proposals were material. "No majority decision of this circuit has addressed the proper standard for assessing the materiality of a false statement under the FCA's civil-liability provisions." Laird, 491 F.3d at 261. The parties and this Court all recognize that "a false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Neder v. United States, 527 U.S. 1, 16 (1999) (quotation omitted) (insertion in original); see also United States v. Southland Mgmt. Corp. (Southland II), 326 F.3d 669, 679 (5th Cir. 2003) (en banc) (Jones, J., concurring); United States v. Southland Mgmt. Corp. (Southland I), 288 F.3d 665, 676 (5th Cir. 2002), vacated by grant of reh'g en banc, 307 F.3d 352 (5th Cir. 2002) (quoting United States v. Wells, 519 U.S. 482, 489 (1997)).

In Southland I, however, we noted two different interpretations of the "natural tendency to influence or capable of influencing" standard. Southland I, 288 F.3d at 676. Some courts have defined the standard to require "outcome materiality" – "a falsehood or misrepresentations must affect the government's ultimate decision whether to remit funds to the claimant in order to be 'material.'" Id. (citing United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala., 104 F.3d 1453, 1459-60 (4th Cir. 1997); United States v. Intervest Corp., 67 F. Supp. 2d 637, 646-48 (S.D. Miss. 1999)). In contrast, another court required what is termed "claim materiality" – "a falsehood or misrepresentation must be material to the defendant's claim of right in order to be considered 'material' for the purposes of the FCA." Id. (citing United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 630 (S.D. Tex. 2001)). In Southland II, five judges of this Court suggested that outcome materiality is the correct standard,

14

explaining that a statement is material only if it actually affects the government's decision to pay. See Laird, 491 F.3d at 261 (citing Southland II, 326 F.3d 669 at 679 n.3).[6]

The Government, however, contends that these definitions are incorrect. It argues that the FCA requires proof only that the defendant's false statements "could have" influenced the government's payment decision or had the "potential" to influence the government's decision, not that the false statements actually did so. We agree. The outcome and claim materiality definitions unnecessarily narrow the "natural tendency to influence or capable of influencing" test, which is unambiguous and easily applied.[7]

The lack of ambiguity in this test is clear when we examine the common meaning of the words used. The Oxford English Dictionary ("OED") defines tendency as "a constant disposition to move or act in some direction or toward some point, end, or purpose; leaning, inclination, bias, or bent toward some object, effect, or result." Oxford English Dictionary Online, www.oed.com (last visited June 15, 2009) (defining "tendency"). The Merriam-Webster Dictionary ("Merriam-Webster") defines tendency as "a proneness to a particular kind of thought or action." Merriam-Webster Dictionary Online, www.merriam-webster.com (last visited June 15, 2009) (defining "tendency"). The OED has two

---

[6] Judge Jones's concurrence first explained that the accepted definition of materiality for civil FCA claims "equates materiality with 'having a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Southland II, 326 F.3d at 679 (quotation omitted) (insertion in original). However, read it is entirety the concurrence implicitly adopts and applies the outcome materiality standard.

[7] Adopting this test for materiality under the FCA aligns with our test for materiality under 18 U.S.C. § 1001, the Federal Criminal False Statements Act. Our decisions state the test for materiality under § 1001 as "'tendency' or 'capacity to influence.'" See generally United States v. McIntosh, 655 F.2d 80, 83 (5th Cir. 1981) (citing United States v. Krause, 507 F.2d 113, 118 (5th Cir. 1975); United States v. McGough, 510 F.2d 598, 602 (5th Cir. 1975)).

definitions of "capable" that apply in this context: "able or fit to receive and be affected by; open to, susceptible" and "able to be affected by; of a nature, or in a condition, to allow or admit of; admitting; susceptible."  Oxford English Dictionary Online, www.oed.com  (last visited June 15, 2009) (defining "capable").  Merriam-Webster defines capable as "susceptible <a remark capable of being misunderstood>."  Merriam-Webster Dictionary Online, www.merriam-webster.com (last visited June 15, 2009) (defining "capable").  Finally, OED defines influence as "ascendancy, sway, control, or authority, not formally or overtly expressed" and as "[a] thing (or person) that exercises action or power of a non-material or unexpressed kind."  Oxford English Dictionary Online, www.oed.com  (last visited June 15, 2009) (defining "influence").  Merriam-Webster defines influence as "the act or power of producing an effect without apparent exertion of force or direct exercise of command," "corrupt interference with authority for personal gain," and "the power or capacity of causing an effect in indirect or intangible ways."  Merriam-Webster Dictionary Online, www.merriam-webster.com (last visited June 15, 2009) (defining "influence").

Thus, the "natural tendency to influence or capable of influencing" test requires only that the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants.  All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions.

Our conclusion is buttressed by cases from our sister circuits.  The Ninth Circuit recently recognized a circuit split to measure materiality under the FCA.  United States v. Bourseau, 531 F.3d 1159, 1171 (9th Cir. 2008).  The court noted that the Fourth and Sixth Circuits have adopted a "'natural tendency test' for

materiality, which focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered." Id. (quoting United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005)); see also United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913, 916-17 (4th Cir. 2003). The court then explained that the Eighth Circuit has adopted the "more restrictive 'outcome materiality test.'" Bourseau, 531 F.3d at 1171 (citing Costner v. URS Consultants, 153 F.3d 667, 677 (8th Cir. 1998)). The Ninth Circuit adopted the Fourth and Sixth Circuits natural tendency test "for materiality because it is more consistent with the plain meaning of the FCA." Id. (citation omitted).

Moreover, Congress recently codified the definition of materiality when it enacted the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009) (to be codified at 31 U.S.C. § 3729). Congress enacted § 4 of FERA to clarify the FCA and "to reflect the original intent of the law." Id. Congress's enactment will add the following language to § 3729(b): "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." If Congress intended materiality to be defined under the more narrow outcome materiality standard, it had ample opportunity to adopt the outcome materiality standard in FERA. Instead, Congress embraced the test as stated by the Supreme Court and several courts of appeals. While we decline to rule on whether this statute applies retroactively or prospectively, we find this enactment to be relevant as to Congress's intent when it enacted the FCA. See NCNB Texas Nat'l Bank v. Cowden, 895 F.2d 1488, 1500 (5th Cir. 1990) ("[A] legislative body may amend statutory language to make what was intended all along even more

unmistakably clear.") (quoting United States v. Montgomery Count, Md., 761 F.2d 998, 1003 (4th Cir. 1985)).

### d. Payment of Money

Finally, the Government argues that the Defendants' knowing, material, false statements caused the government to pay out money. Neither party disputes that the government awarded approximately $1.6 million to Lithium Power as a result of the four SBIR grant proposals. Thus, we are left with determining whether the Government has successfully demonstrated factors one, two, and three of the above test.

### 2. Analysis

The Government has met its burden with regards to factors one and two–the Defendants knowingly provided false or fraudulent statements in the SBIR grant proposals. Most egregiously, the Defendants lied in all four SBIR grant proposals regarding a cooperative arrangement with the University of Houston and Polyhedron Laboratories. The Defendants argued below that because members of the public could use labs at the University of Houston and Polyhedron Laboratories for a fee, Lithium Power, as a member of the public, had an "arrangement" with both institutions. This argument is patently absurd. The Defendants either purposefully, or with reckless disregard to the truth or the falsity of their statements, misled the BMDO and the Air Force into believing that Lithium Power had a formal partnership with these two organizations. The ability of any member of the public to essentially "rent" the facility is not synonymous with a cooperative arrangement of the type the Defendants hoped the government would infer by their statements. These misrepresentations alone would be sufficient to establish that the Defendants had no intention to perform according to the terms of the SBIR, but these are not the only false statements contained in the SBIR grant proposals.

The Defendants' BMDO Phase I grant contained an incorrect incorporation date for Lithium Power. This was not a mere typographical error, as Lithium Power was not incorporated until five months after it submitted its Phase I grant proposal to BMDO. In addition, the Defendants lied about the existence of Lithium Power's facilities, which were under construction at the time the SBIR Phase I grant proposal was submitted. These false statements, especially when considered in conjunction with the misrepresentation regarding a cooperative arrangement with the University of Houston and Polyhedron Laboratories, left the BMDO with the impression that Lithium Power was a much more established and experienced company than it actually was. Thus, the Defendants had no intention to perform according to the terms as outlined in the BMDO SBIR grant proposals, because they did not portray Lithium Power accurately in the proposals. Because the receipt of a Phase II grant was predicated on the Phase I grant, any false or fraudulent statements made in the BMDO Phase I grant equally taints the BMDO Phase II grant.

We also find troubling Lithium Power's failure to disclose receipt of the BMDO grants when applying for an additional SBIR grant from the Air Force. The SBIR application required applicants to describe "significant activities directly related to the proposed effort" and "previous work not directly related to the proposed effort but similar." Lithium Power states that it told individual members of the Air Force that it also received the BMDO grants, but that does not negate the fact that it failed to account for the BMDO grants in its SBIR grant proposals to the Air Force. This omission, again when coupled with the misrepresentations regarding Lithium Power's cooperative agreements, establish that the Defendants had no intention to perform according to the terms of the SBIR.

The Government has also successfully demonstrated factor three–Lithium Power's false statements were material. As we explained above, the test for determining whether a false statement is material is whether it has a "natural tendency to influence or is capable of influencing" the government's decision-making. We are convinced that Lithium Power's false statements had the potential to influence the BMDO and Air Force's decisions to award Lithium Power the SBIR grants. Lithium Power painted a picture of an established company, that was so well-respected in the community that it had developed a strong relationship with two notable research organizations. In reality, Lithium Power was a company that was in its preliminary stages of development that had yet to demonstrate any proven success.

Moreover, in the instant case we also have evidence that the false statements actually influenced the decision to award the Defendants the SBIR grants.[8] One of the BMDO Phase I evaluators recommended approving the proposal because Lithium Power had adequate facilities to conduct the project–in actuality Lithium Power had no such facilities. In addition, another BMDO Phase I evaluator stated that his recommendation to fund Lithium Power's proposal was greatly influenced by the false statements. Finally, the evaluator who approved the Air Force proposals stated that he would not have approved funding the Air Force proposals if the Defendants had included information regarding the BMDO SBIR grants in Lithium Power's Air Force SBIR grant proposal.

Based on the foregoing analysis, we conclude that the Defendants violated the FCA. The irony of this situation is not lost on the court. Lithium Power blatantly deceived the BMDO and the Air Force and received funds that it was

---

[8] Thus, even if we were to apply the "outcome" materiality standard, we would still conclude that Lithium Power's false statements were material.

not entitled to. But it appears that the company then went on to successfully design and manufacture lithium-based batteries that the BMDO and the Air Force found to be satisfactory. The Defendants ability to deliver on the hoped for "ends," however, does not justify the means it employed to receive the SBIR grants. We affirm the judgment of liability.

C. Damages Award[9]

The district court held that the Government suffered damages in the amount of the grants it paid out to the Defendants in connection with their deceptive proposals–$1,657,455–and awarded treble damages in the amount of $4,972,365. The Defendants argue that the Government is not entitled to damages because it did not suffer an "injury." The Defendants argue that the district court erred in granting the damages award and state that no "court has ever applied a fraudulent inducement/disgorgement theory in the absence of some tangible injury to the government." In response, the Government argues that the Defendants' false statements caused more than $1.6 million of DoD SBIR funding to be siphoned off by a company with "dubious qualifications" and that the funding should have gone to a better-qualified candidate.

An individual who violates the FCA is liable to the United States for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." See 31 U.S.C. § 3729(a). No circuit court has previously addressed the proper method of calculating damages for a fraudulently induced research grant. This Court has held, however, that damages are limited to the amount that was paid out by reason of the false claim. United States v. Aerodex, Inc. 469 F.2d 1003, 1011 (5th Cir. 1972). Before the government may recover treble damages,

---

[9] We review the damages award in this case de novo, because it was decided through a motion for summary judgment.

it must "demonstrate the element of causation between the false statements and the loss." See United States v. Miller, 645 F.2d 473, 475-76 (5th Cir. 1981).[10] In United States v. Bornstein, the Supreme Court explained that when deducting the "bargain" received from a defendant, a court must begin with the already doubled (and now tripled) amount. 423 U.S. 303, 314 (1976) (superceded on different grounds); see also United States v. Thomas, 709 F.2d 968, 972 (5th Cir. 1983).[11]

The contracts entered into between the government and the Defendants did not produce a tangible benefit to the BMDO or the Air Force. These were not, for example, standard procurement contracts where the government ordered a specific product or good. The end product did not belong to the BMDO or the Air Force. Instead, the purpose of the SBIR grant program was to enable small businesses to reach Phase III where they could commercially market their products. The Government's benefit of the bargain was to award money to eligible deserving small businesses. The BMDO and the Air Force's intangible benefit of providing an "eligible deserving" business with the grants was lost as a result of the Defendants' fraud. Finally, a direct causal relationship existed between the funds received by the Defendants and their false statements.

In a case such as this, where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants. The

---

[10] At the time Miller was decided, the Government could recover only double, not treble, damages under the FCA.

[11] The Career College Association filed as amicus curiae urging support of the district court's damages award. They also argue, however, that in calculating damages the court should subtract the value of the benefit that the Defendants conferred on the Government from the amount the Government paid to the Defendants and then treble this "actual-damages" figure. The proposed method does not comport with the Supreme Court's holding in Bornstein or our holding in Thomas and we reject it.

district court correctly determined that the proper amount of damages for the four SBIR proposals was the entire amount the Defendants' received–$1,657,455.  The district court then correctly multiplied the amount of damages by three, as required by statute, for a trebled damages award of $4,972,365.  We affirm the damages award.

D.  Claims for Release and Indemnification

The district court ruled that Longhi's agreement to release and indemnify the Defendants from suit related to any "matter prior to execution of" the agreement to sell the stock was unenforceable because (1) federal public policy bars the enforcement of releases in qui tam cases, and (2) the FCA prohibits a qui tam plaintiff from dismissing a FCA claim.  The Defendants argue that the district court erred and rely on Ninth Circuit case law to support their assertion that if a relator has already filed his claim at the time of signing the release, the courts have enforced the releases.  See United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233 (9th Cir. 1997).  In addition, the Defendants argue that the FCA does not bar the release and indemnification agreement because Longhi's release did not prohibit the Government from pursuing any of the claims in this lawsuit.  With respect to the indemnification clause contained on the stock sale agreement, the Defendants argue that the cases cited by the district court address common law claims for indemnification not contractual indemnification, which is governed by the Supreme Court's decision in  Town of Newton v. Rumery, 480 U.S. 386 (1987).  Longhi argues that the district court correctly concluded that the release and indemnification were unenforceable as they apply to Longhi's FCA allegations because, inter alia, the text of the FCA invalidates the release.

The Defendants' arguments are unavailing because the release and indemnification clauses are invalid under the plain language of the FCA.  When

23

an individual brings a qui tam suit under the FCA, the action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting. See 31 U.S.C. § 3730(b)(1). Once filed by the relator, the complaint must remain under seal for at least sixty days, and is not served on the defendant until the court so orders. § 3730(b)(2). The Government may choose to intervene and proceed with the action within the sixty days after it receives the complaint, material evidence, and information, but the Government may extend the sixty-day evaluation period with a showing of good cause to the court. § 3730(b)(3). The district court correctly found that Longhi signed the release eleven days after he filed the qui tam complaint and was therefore unable to personally dismiss the case. In addition, the district court correctly held that even if the release and indemnification were valid, Longhi could not have entered into it at the time he did without the express knowledge and consent of the United States, because the statutory sixty-day review window still governed. This outcome comports with our decision in Searcy v. Phillips Electronics North American Corp., where we held that the United States has absolute power to veto any settlement between a relator and defendant corporation. 117 F.3d 154, 160 (5th Cir. 1997).

Furthermore, the interest in enforcing the release and indemnification clauses are outweighed by public policy concerns. The Supreme Court's decision in Rumery establishes the framework for determining whether public policy prevents enforcement of the release and indemnification in the limited context of this qui tam case. Specifically, the Supreme Court held that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement." Rumery, 480 U.S. at 392 (citation omitted). The public policy interest implicated in this case is the ability of the Government to obtain information from relators

it could not otherwise obtain. It is in the Government's best interest to gain full information from the relator. To enforce the release and indemnification clauses contained in the stock sale agreement against Longhi would ignore the public policy objectives expressly spelled out by Congress in the FCA and would provide disincentives to future relators. In addition, enforcing the release and indemnification clauses would encourage individuals guilty of defrauding the United States to insulate themselves from the reach of the FCA by simply forcing potential relators to sign general agreements invoking release and indemnification from future suit. The district court correctly determined that enforcing the release against Longhi is against public policy. We affirm.

## E. Defendants' Motion for Summary Judgment

The Defendants argue that the district court should have granted their motion for summary judgment. Because we have affirmed the district court's decision to grant the Government's motion for summary judgment, we find no error.

## III. ATTORNEYS' FEES

The Defendants argue that we should reverse the award of attorneys' fees because Longhi failed to segregate the non-compensable work performed by his counsel. In response, Longhi argues that under the FCA he is entitled to an award of attorneys' fees for all time reasonably expended on his behalf in pursuit of the achieved result. Longhi asserts that it is legally irrelevant that he expended a small, limited amount of time in connection with claims that were not actively litigated in the case.

## A. Standard of Review

The parties dispute the applicable standard of review. Only two of our cases, both unpublished, discuss the applicable standard for reviewing a district court's award of attorneys' fees under the FCA. United States v. Medica Rents

Co. Ltd., No. 03-11297, 2008 U.S. App. LEXIS 17946, at *1 (5th Cir. 2008); U.S. ex rel. Bain v. Georgia Gulf Corp., 208 F. App'x 280, 282 (5th Cir. 2006). In both instances, we applied an abuse of discretion standard when reviewing a district court's award of attorneys' fees.[12] Thus, we apply an abuse of discretion standard of review to the instant case. In Bain, we explained that the abuse of discretion standard of review is consistent with our review of attorneys' fees under similar circumstances. 208 F. App'x at 282 (citing Skidmore Energy, Inc. v. KPMG, 455 F.3d 564, 566 (5th Cir. 2006)). "Under the abuse of discretion standard, a district court's decision to award attorneys' fees will not be disturbed unless the award is based on (1) an erroneous view of the law or (2) a clearly erroneous assessment of the evidence." Id. See also Travelers Ins. Co. v. St. Jude Hosp. of Kenner, Inc., 38 F.3d 1414, 1417 (5th Cir. 1994); Alizadeh v. Safeway Stores, Inc., 910 F.2d 234, 237-38 (5th Cir. 1990); Cobb v. Miller, 818 F.2d 1227, 1231 (5th Cir. 1987) (stating that the ultimate award of attorney's fees is reviewed for abuse of discretion); EEOC v. First Ala. Bank, 595 F.2d 1050, 1056 (5th Cir. 1979).

## B. Analysis

Section 3730(d)(1) of the FCA states that a relator in a successful qui tam action is entitled to "receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." 31 U.S.C. §3730(d)(1). The question is whether Longhi's attorneys' fee award should be segregated because he was not "successful" in proving a violation of the FCA with regards to all twenty-one contracts, as he initially

---

[12] We note that Bain and Medica Rents involve § 3730(d)(4) of the FCA and the instant case involves § 3730(d)(1) of the FCA. We find this to be a distinction without relevant difference in determining the appropriate standard of review.

alleged.  We find the Supreme Court's decision in Hensley v. Eckerhart, to be instructive.  461 U.S. 424 (1983).

In Hensley, the Supreme Court reviewed an award of attorneys' fees pursuant to the Civil Rights Attorney's Fees Awards Act for fees incurred during civil rights litigation where the plaintiffs did not prevail on all of their claims. Id. at 426.  The Court stated that "plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Id. at 433 (quotation and internal quotation marks omitted).  The Supreme Court explained that a plaintiff might bring distinctly different claims that are based on different facts and legal theories, and in such an instance "work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'"  Id. at 435 (quotation omitted).  The Court also explained, however, that there are sometimes instances where a "plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories."  Id. at 435.  In those instances, where much of counsel's time is "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  Id.

The district court properly noted the standards set out by Hensley and expressly determined that the claims regarding the performance on the contracts and the claims alleging fraudulent inducement were not factually distinct.  The district court determined that the claims regarding the four SBIR contracts arose from the same set of contracts, same actors, and the same illegal intent to defraud the government of money in violation of the FCA.  The district court also

determined that the fees related to the four SBIR contracts should not be segregated from the other claims.

We hold that the district court did not abuse its discretion in finding that the level of success on the four SBIR contract claims alone was sufficient enough to merit entitlement to a full attorneys' fees award. The district court reviewed the billing records and found no duplicative efforts or unnecessary hours, and thus found that Longhi's counsel's billing record to be reasonable. We affirm.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment on all claims.